Dilian CASTRO–MEDINA, Plaintiff,

v.

The PROCTER & GAMBLE COMMERCIAL CO., et als., Defendants.

Civ. No. 04–2274 (PG).

United States District Court, D. Puerto Rico.

June 28, 2008.

---

346

Enrique J. Mendoza–Mendez, Mendoza Law Office, San Juan, PR, for Plaintiff.

Pedro A. Delgado–Hernandez, O'Neill & Borges, San Juan, PR, for Defendants.

## *OPINION AND ORDER*

JUAN M. PEREZ–GIMENEZ, District Judge.

Plaintiff Dilian Castro Medina (hereinafter "Plaintiff" or "Castro") filed this action under the Americans with Disabilities Act of 1991 ("ADA" or "the Act"), 42 U.S.C. § 12101 *et seq.,* against her employer, The Procter & Gamble Commercial Company ("P & G", "Defendant" or "the Company"), alleging discrimination and harassment on the basis of a protected disability. *See* Docket No. 1. As part of her discrimination claim, Plaintiff alleges that P & G failed to reasonably accommodate her disability, and wrongfully terminated and retaliated against her for engaging in protected conduct. She also alleges the Defendant retaliated against her and interfered with the exercise of her rights under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2611 *et seq. Id.* Finally, Plaintiff includes supplemental state law claims based upon Puerto Rico's wrongful termination, retaliation, disability and general negligence statutes. *See* P.R. Laws Ann. tit. 1, § 501, *et seq.;* P.R. Laws Ann. tit. 29, § 185, *et seq.;* P.R. Laws Ann. tit. 29, § 194, *et seq.;* P.R. Laws Ann. tit. 31, § 5142.

P & G moved for summary judgment requesting the dismissal of the claims brought forth by Plaintiff on the grounds that Castro is unable to establish a *prima facie* case of disability discrimination. The Defendant argues that Castro is not disabled within the definition of the ADA and

was not qualified for the job. The Defendant also argues that Plaintiff is unable to prove her failure-to-accommodate and harassment claims. Finally, the Defendant proffers that its actions were not motivated by Plaintiff's alleged condition or for having taken FMLA leave. The Company also argues that it did not retaliate against Plaintiff for having filed a charge with the Anti–Discrimination Unit ("ADU") and the present claim. On the contrary, the Defendant claims that its actions were based on legitimate grounds. *See* Dockets No. 40–42. Plaintiff's opposition, Defendant's reply, and Plaintiff's sur-reply thereto have also been submitted for our consideration. *See* Dockets No. 50–51, 60–61, 76.

Also before the Court is the Defendant's motion to strike certain materials supporting Plaintiff's opposition to the motion for summary judgment. *See* Docket No. 62. Therein, P & G challenges the admissibility of: (1) a reporting letter from rheumatologist Dr. Jorge Mundo, Plaintiff's treating physician; (2) Plaintiff's medical file with another physician, Dr. Jose Roman, along with a typewritten note; (3) Castro's

medical file with a family physician, Dr. Raymond Tasch; and (4) an expert witness report by psychiatrist Dr. Jose Villanueva. *See* Docket No. 62. Also before the Court is Plaintiff's opposition to Defendant's motion to strike, and a reply and sur-reply thereto. *See* Dockets No. 65, 75 & 77. Defendant's motion for summary judgment and the motion to strike are related, and thus, the Court has determined to address the objections advanced in the latter on a point-by-point basis to the extent necessary in deciding the dispositive motion.

After a close examination of all the evidence on record and a careful review of the applicable statutory and case law, the Court **GRANTS IN PART** P & G's motion for summary judgment and **GRANTS IN PART AND DENIES IN PART** P & G's motion to strike for the reasons explained below.

## I. FACTUAL FINDINGS

The following relevant facts are undisputed [1]:

**Plaintiff**

1. During Plaintiff Dilian Castro–Medina's employment at P & G, she was

---

1. Local Rule 56(c) states that a non-movant's opposing statement of material facts shall admit, deny or qualify the facts submitted by the movant, and in so doing, "shall support each denial or qualification by a record citation as required by this rule." Local Rule 56(c). It is widely known that "[t]he moving party, along with its statement of uncontested facts, has the initial burden of pointing out the absence of evidence and the non-moving party, along with its statement of contested facts, has the *ultimate burden* of setting forth the specific facts that create a genuine issue for trial. The rule also does not change the non-moving party's burden of coming forward with more than a trivial, 'scintilla of evidence' or creating more than a 'metaphysical doubt as to the material facts.' ... Once the non-movant comes forward with more than a scintilla of evidence, the Court construes the material facts and reasonable inferences drawn therefrom in favor of the non-moving party."

*Dominguez v. Eli Lilly and Co.*, 958 F.Supp. 721, 727 (D.P.R.1997) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986))(emphasis ours).

After a close perscrutation of Plaintiff's opposing statement of material facts (Docket No. 51), we find that Castro failed to properly contest the vast majority of Defendant's statement of facts. Plaintiff's denials and qualifications of Defendant's fact statements are either irrelevant to the matter at hand, or consist of mere "speculation, generalities, conclusory assertions, improbable inferences, and, for lack of a better phrase, a lot of 'hot air.' " *Eli Lilly and Co.*, 958 F.Supp. 721, 728 (D.P.R. 1997). As a result, unless otherwise stated, the Court will cull the relevant facts from Defendant's Statement of Uncontested Facts (Docket No. 42).

diagnosed with fibromyalgia, depression and other lesions (herniated disks, severe cervico-lumbar trauma, and others) stemming out of an automobile accident that occurred in August of 2002. Due to these conditions, Castro was required to take leaves of absence. See *Amended Complaint*, Docket No. 6, ¶¶ 7, 10, 12; *Amended Answer*, Docket No. 11, ¶¶ 7, 10, 12.

## The Company

2. P & G sells and distributes consumer products, and through a special arrangement assists an affiliated entity, PG Pharmaceuticals, in the marketing and sale of pharmaceutical products in Puerto Rico. *See* Docket No. 42, ¶ 1.

3. P & G maintains an express written policy prohibiting any type of discrimination, including disability discrimination and/or harassment in the workplace. This policy is shared with all employees, including Plaintiff, upon enrollment. *Id.* at ¶ 47.

4. The policy is published in the personnel manual and policy statements as well as P & G's intranet. *Id.* at ¶ 48.

5. P & G's anti-harassment policy prohibits such conduct and provides an internal grievance procedure to report any type of complaint for investigation and resolution. *Id.* at ¶ 49.

## Plaintiff's Employment

6. Plaintiff Dilian Castro was an employee of the Company from February of 1998 until March 4, 2005, when her employment was terminated. Id. at ¶ 2.

7. Plaintiff began work as a Secretary in PG Commercial's Customer Business Development Department, with a salary of $21,000. Id. at ¶ 7.

8. On April 1, 2000, she was promoted to a managerial position (Medical Account Manager) in the Pharmaceutical Group. Her yearly salary increased from $24,200 to $45,200. Id. at ¶ 7.

9. On March 2, 2004, Plaintiff was involved in a car accident and took a leave of absence to seek medical treatment with the Puerto Rico State Insurance Fund ("SIF"). The Defendant asserts that Plaintiff's employment terminated on March 4, 2005 upon lapse of a twelve-month leave of absence for treatment with the SIF.[2] Id. at ¶ 16.

## Medical Account Manager Position

10. As a manager, Plaintiff was not subject to a fixed "9 to 5" work schedule. Id. at ¶ 7.

11. P & G's Medical Account Managers are expected to visit at least 9 physicians a day (9 "calls" a day); educate them on the assigned products; and, distribute samples of the products (medications) to those targeted physicians. Their overall objective is to increase the products' market share by incrementing prescription volume in Puerto Rico. Id. at ¶ 34.

12. Plaintiff failed to meet the position's objectives. During the time that she actually worked (discounting her leaves of absence), her call average was as follows:

| Period | Compliance Percentage |
| --- | --- |
| July–December 2000 | 48% |
| January–June 2001 | 61% |
| July–December 2001 | 14% |
| January–June 2002 | 38% |
| July–December 2002 | 70% |
| January–June 2003 | 6% |
| July–December 2003 | 53% |

Id. at ¶ 35.

13. Plaintiff was advised of these deficiencies in her 2003 evaluation ("Work

---

**2.** An employee has fifteen (15) days after discharge from the State Insurance Fund to request reinstatement, provided this request is not made after the lapse of twelve months from the date of the accident. P.R. Laws Ann. tit. 11, § 7. The twelve months term is a term of caducity. *Rivera–Flores v. P.R. Telephone*, 64 F.3d 742 (1st Cir.1995).

and Development Plan"), through a "Performance Improvement Discussion" on February 18, 2003, and on a follow up note on September 2, 2003. Id. at ¶ 36.

14. Her peers were similarly advised as follows: Ms. Dolyssa Campos ("Performance Improvement Discussion," 2000); Mr. Mario Anglada ("Work and Development Plan," 2000, 2002, 2003); Mr. Joaquin Ortiz ("Work and Development Plan," 2000, 2004); Mr. Israel Rosado ("Work and Development Plan," 2002, 2003); Mr. Onofre Rivera ("Work and Development Plan," 2003); and Mr. Carlos Velez ("Work and Development Plan," 2003, 2004). Ms. Campos was terminated for failure to reach her call objectives, among other expense report issues. Id. at ¶ 35.

### Expense Reports

15. As part of her duties, Castro was expected to prepare expense reports during downtime and off-hours. Instructions on how to fill these expense reports are posted in the Company's intranet. Id. at ¶¶ 7, 21.

16. As a Medical Account Manager, Castro was required to submit expense reports to her supervisor. Initially, the reports were to be submitted on a monthly basis. Afterwards, every two weeks. These reports are critical for P & G's internal controls and the proper utilization of Company funds. They are used to make sure employees receive reimbursement for business expenses they have incurred. Id. at ¶ 21.

17. During Plaintiff's employment with the Company, she failed to comply with the Company's expense report procedures. Plaintiff admits that sometimes she did not submit the expense reports for months. Id. at ¶ 21.

18. On February 18, 2003, by means of a written "Work and Development Plan" and a "Performance Improvement Discussion," the Company warned Plaintiff to correct this problem. Id. at ¶ 23.

19. On February 16, 2005, while Plaintiff was on her medical leave with the SIF, she was once again warned of the need to submit timely expense reports. It stems from Plaintiff's admissions during her deposition that when Plaintiff reported to the SIF on March 2, 2004, she had not submitted the required expense reports since December of 2003, and did not prepare them until March 23, 2005. See id. at ¶ 24; Docket No. 42, Exhibit C, pgs. 81–82.

20. Plaintiff, a Manager, attributes her failure to submit timely expense reports to her lack of understanding on how to prepare them. She wanted the Company to give her: (1) extra coaching on expense report preparation; (2) time off work to prepare them, and; (3) that her peers should assist her on preparing her reports. Id. at ¶ 25.

21. P & G also warned other Medical Account Managers (Ms. Dolyssa Campos, Mr. Joaquin Ortiz) of the need to comply with the established expense report procedures. Id. at ¶ 26.

### Corporate Credit Card

22. As a Medical Account Manager, Plaintiff was required to have an American Express corporate credit card to cover business-related expenses. Id. at ¶ 27.

23. Plaintiff applied for an American Express corporate credit card but American Express denied her application because of her poor credit rating. Nevertheless, Mr. Edwin Piazza ("Piazza"), Plaintiff's immediate supervisor, approved and recommended Castro's request that P & G guarantee the issuance of an American Express corporate credit card for her. P & G guarantees

accounts as an exception. Id. at ¶¶ 28–29.

24. As part of the guarantee, Plaintiff had to abide by P & G's card usage policies and procedures. Thus, if American Express cancelled or suspended her corporate-guaranteed credit card, she risked disciplinary action, including termination. Id. at ¶ 30.

25. Plaintiff's failure to submit her expense reports led to several warnings regarding corporate card suspension. Plaintiff did not heed these warnings. Instead, American Express suspended Plaintiff's corporate card on several occasions. Id. at ¶ 31.

26. On February 18, 2003, Plaintiff was advised of this problem through a "Work and Development Plan" and "Work Improvement Discussion" with her supervisor (see Factual Finding No. 18). On February 16, 2005 (while on leave with the SIF), the Company again warned her of these problems in writing. P & G sent Castro a letter informing her that her failure to "submit a single expense report after 12/15/03 led to the accumulation of overdue amounts and delinquency charges to [her] Corporate AMEX Card," and thus, to its cancellation. Because Castro's Corporate AMEX Card was guaranteed by the Company, P & G was legally required to liquidate the balance on her account, including delinquency charges in the total amount of $1,192.03. Id. at ¶ 32.

27. Plaintiff's peers (Mr. Joaquin Ortiz, Mr. Mario Anglada) have also been warned, and even sanctioned, for issues related to their American Express corporate card accounts. Id. at ¶ 33.

### Territory Assignments

28. During Plaintiff's employment with P & G, the Company divided Puerto Rico into territories, and assigned Medical Account Managers to cover the territories. The territories were arranged into two big groups, RED and BLUE. The RED group had two representatives, each of which covered half of Puerto Rico (East and West). The BLUE team had two territories within each RED zone, for a total of four BLUE territories and two RED territories. Id. at ¶ 37.

29. With her appointment as Medical Account Manager, Plaintiff requested her supervisor to assign her the RED east territory (covering an area extending from the San Juan metropolitan area to Juana Diaz; and through Caguas, to Humacao, Fajardo and Carolina). She explained that since she took her children to school in Rio Piedras in the mornings, it would make her route easier. Her supervisor granted her request. Id. at ¶ 38.

30. On January 22, 2002, while on leave of absence (due to her fibromyalgia), Plaintiff requested to be assigned to either the BLUE metropolitan area territory or the BLUE Bayamon territory. These BLUE territories opened due to the transfer of Ms. Luisa Febres, previously assigned to the BLUE metropolitan area territory. The Defendant denied Plaintiff's request on January 24, 2002. Id. at ¶ 39 & Exhibit R.

31. Instead, P & G assigned Mr. Mario Anglada, who had been working in the BLUE Bayamon territory, to the BLUE metropolitan area territory. Mr. Anglada, hired on October 27, 1997, had more company seniority and experience than Plaintiff as Medical Account Manager. Id. at ¶ 40.

32. The BLUE Bayamón territory was not assigned to Castro either. In the alternative, it was assigned to Mr. Israel Rosado, a new hire with seven (7) years of experience in similar positions with

competing pharmaceuticals, such as Schering Plough. Most of his experience was attending physicians in the Bayamon area. Id. at ¶ 41.

33. At that time, Plaintiff expressed to her supervisor, Mr. Piazza, that she felt penalized for being sick. She also stated that, although she was happy with her territory, she would prefer the change because the territories she applied for were geographically less extensive. Id. at ¶ 42.

34. In response, the supervisor explained to Plaintiff that she already covered part of the metropolitan area within her territory; and authorized her to target physicians by importance instead of geography. With this arrangement, Plaintiff spent approximately 90.73% of her time in the metropolitan area. Id. at ¶ 43.

35. In December 2003, Plaintiff and Mr. Israel Rosado requested a transfer to the BLUE metropolitan area territory, which would be vacant as a result of Mr. Mario Anglada's transfer to another position. Id. at ¶ 44.

36. Instead, the Company selected Ms. Vanessa Peréz, a new hire, for the territory. Ms. Peréz had over ten (10) years of experience at a competing pharmaceutical company (Eli Lilly) working the metropolitan territory. Id. at ¶ 45.

37. Although during Plaintiff's tenure as Medical Account Manager she sought treatment with, at least, seven (7) different doctors, none gave her a written recommendation indicating that any condition she may have had required a change in territory. Id. at ¶ 46.

### Leaves of Absence

38. In the initial evaluation corresponding to her first 17 months of employment (prior to her promotion to Medical Account Manager), signed by Plaintiff on November 2, 1999, her supervisors observed that Castro needed to improve on her absenteeism because it could infringe upon the team's ability to achieve its objectives and speed to market. Her supervisor noted that although there are instances when one cannot control being out due to health and personal issues, Plaintiff was absent quite often. See id. at ¶ 8, Exhibit G.

39. Thereafter, Plaintiff was absent on the following dates:

| Dates: | Asserted Reason: |
|---|---|
| 8/6/2001–2/4/2002 (6 months) | Fibromyalgia |
| 8/8/2002–8/18/2002 (7 days) | Fibromyalgia |
| 8/19/2002–1/13/2003 (5 months) | Auto accident |
| 2/24/2003–6/30/2003 (5 months) | Back |
| 8/25/2003–8/27/2003 (3 days) | Back |
| 10/30/2003–11/3/2003 (3 days) | Depression |
| 11/4/2003–12/1/2003 (1 month) | Depression |
| 1/8/2004–1/21/2004 (10 days) | Chicken pox |
| 3/2/2004–3/4/2005 (12 months) | Auto accident |

Id. at ¶ 9.

40. In her 2003 evaluation ("Work and Development Plan"), through a "Performance Improvement Discussion" on February 18, 2003, Plaintiff was also advised that if she improved her absenteeism, she would be able to meet and surpass the job expectations. See id., Exhibit B–3.

41. From August 2001 through her termination on March 4, 2005, a time span of three (3) years and seven (7) months, she was absent for approximately 878 days (the equivalent of 2 years and 5 months or 67% of the time). Id. at ¶ 9.

42. During Plaintiff's June 2003 leave of absence, P & G hired an independent consultant for the purpose of making recommendations as to what reasonable measures could be taken in order to assist Plaintiff in meeting her job responsibilities. Id. at ¶ 13, Exhibit I.

43. To that end, the consultant suggested that Plaintiff carry a portable scale to weigh her work materials; that she use a lightweight briefcase; and that bins be purchased to organize the work materi-

als in the trunk of the Company car. Id. at ¶ 14.

44. The Defendant followed the consultant's recommendations, paying for a portable weight scale for Plaintiff's Company car's trunk; a light briefcase of her choice to carry her materials; and, special containers to organize materials in the trunk of Plaintiff's assigned car. Id. at ¶ 15.

45. Upon return to work from the various leaves of absence she took (except the 3/2/2004–3/4/2005 leave of absence), Plaintiff returned to her position and responsibilities, enjoying the same salary and benefits. Her supervisor indicated that Plaintiff needed to concentrate her work building relationships and visiting those physicians. Id. at ¶ 10.

46. During her leaves of absence (except for her final twelve-month leave), Plaintiff enjoyed full supplementary payment (100%) of her salary, paid in part by P & G and the Company's insurance carrier, Met Life. Id. at ¶ 11.

47. During her leaves of absence, P & G allowed Plaintiff to use the Company car, the Company computer, and Internet access (except during her last leave), and paid for the use of these items. These benefits were given to Plaintiff for work purposes. The car's expenses included gasoline, maintenance, repairs and car rental when repairs were required. Id. at ¶ 12.

48. During these absences, most of the physicians in Plaintiff's assigned territory remained unattended. Id. at ¶ 9.

**Salary Increases**

49. During Plaintiff's employment, the Company granted her various salary increases:

| Year | Increase |
| --- | --- |
| 1998 | $1,680.00 |
| 1999 | $1,832.00 |
| 2000 | $1,992.00 |
| 2001 | $3,616.00 |
| 2002 | $3,856.00 |
| 2003 | $3,856.00 |
| 2004–2005 | $4,272.67 |

Id. at ¶ 53.

*Plaintiff's Complaints*

50. After Plaintiff's supervisor followed up with her in September of 2003 about her persistent expense report and call objective problems, Plaintiff sent him an email on October 3, 2003 claiming that she was disabled and that he was discriminating against her. The day before her e-mail, on October 2, 2003, she had filed an administrative claim with the Anti-discrimination Unit of the Puerto Rico Department of Labor and Human Resources. Id. at ¶ 50; Docket No. 51, Exhibit 15.

51. Prior to receiving notice of the charge, on November 10, 2003, P & G warned Plaintiff in writing that she had been absent on certain dates and failed to provide a medical certificate for the absences. Hence, the Company instructed Plaintiff to provide proper documentation regarding the absences or otherwise, her employment would be terminated. See Docket No. 42, ¶ 51.

52. To authorize leaves of absence, P & G requires its employees to justify the leave by providing the necessary medical certificates to the Company's medical group. The certificates have to contain sufficient information for the Company to evaluate and approve the requested leave. Id. at ¶ 52.

53. Castro submits that she was unable to send the medical certificate because the Company fax was not working. Notwithstanding, after receiving the Company's warning, she complied. See Docket No. 51, Exhibit 25.

54. Thereafter, Plaintiff amended the discrimination charge to allege that P & G was retaliating against her. Id. at ¶ 52.

### Termination

55. Plaintiff contacted the Company on February of 2005, and informed them that her next appointment with the SIF was on March 30, 2005, and that she did not feel like she could return to work. See Docket No. 51, Exhibit 4, page 30.

56. Upon lapse of a twelve-month leave of absence for treatment with the SIF, in a letter dated March 8, 2005, P & G informed Plaintiff that her employment was being terminated because of her failure to return from a twelve-month leave of absence with the SIF. At the time of termination, Plaintiff had not been cleared to work by the SIF, or provided an expected release date. See Docket No. 42, Exhibit A–6, Exhibit C, 32: 13–19.

57. On March 14, 2005, Plaintiff sent a letter to the Defendant stating her disagreement with the Company's decision to terminate her employment. In her letter. Plaintiff also asserted that the Company knew that her next appointment was not until March 30, 2005, and thus, it would not be until then that she would know whether or not she would be released to work. See Docket No. 42, Exhibit A–7.

58. Plaintiff failed to attend the off-boarding session, initially scheduled for March 11, 2005, on several occasions because of illness, and submitted a medical certificate to that effect. She further postponed the session until March 23, 2005. Id. at ¶ 52.

59. On April 4, 2005, a month after her employment had finalized, P & G received via fax a letter from Plaintiff stating that the SIF had released her to work on March 30, 2005. She suggested that the Company reconsider her termination, and requested immediate reinstatement. See Docket No. 61, Exhibit A.

60. Plaintiff's letter was the first and only time in the preceding thirteen (13) month period that she sought reinstatement or gave any indication that she was able to return to work. See Docket No. 42, ¶ 20; Docket No. 51, ¶ 20.2.

61. On April 8, 2005, P & G responded to Plaintiff's letter as follows:

Dear Dilian:

This acknowledges receipt of your letter dated March 31, 2005, received via fax on April 4, 2005. In that letter, you ask us to immediately reinstate you to work despite the following:

This is the first time you seek reinstatement after being absent from work for more than thirteen (13) months, that is, since March 2, 2004.

This is the first time that you provide a certificate for the purpose of considering you authorized to work since you went on leave more than thirteen (13) months ago.

You seek reinstatement for the first time more than a month following the conclusion of your one-year medical leave, and the termination of your employment.

. . .

We reserved your employment for more than a year, from your last day of work on March 2, 2004, through March 4, 2005. During that period of time you were neither given permission to work on "CT" status nor released from treatment by the State Insurance Fund. It was not until a month following the conclusion of your one-year medical leave that the State Insurance Fund released you from treatment.

Further, during that period of time you never requested reinstatement to work. You never gave any indication that you would return to work. In fact, when you notified us in early February 2005 that you had a regular follow up visit at the State Insurance Fund on March 30th (which is a requirement under our benefits policies to continue receiving pay during a medical leave) you specifically mentioned that you were still feeling ill, and believed it was unlikely that you would be able to return to work. In addition, upon receipt of the termination letter, you asked to reschedule your off-boarding session several times between March 8th and March 23d because you continued to feel ill.

. . .

Consequently, we reiterate our March 8, 2005 communication, which notified you of the termination of your employment effective March 4, 2005.

. . .

Regards,

Maria Isabel Ortiz.

See Docket No. 42, ¶ 20.

### Plaintiff's Daily Routine

62. As per Plaintiff's own admissions in her deposition, Plaintiff starts her daily routine at 5:30–6:00 a.m. She wakes up; gets out of bed; uses the bathroom; brushes her teeth; bathes; gets dressed; fixes her hair and makeup; almost always cooks; takes her daughter to school; goes back to her house and does whatever she can if it is possible to do anything in the house; picks up her daughter; watches TV; works with her plants; and sometimes reads. She also smokes one pack of cigarettes daily. *Id.* at ¶ 55.

63. Plaintiff has a driver's license. She has been an authorized driver since she was 18 or 19 years old (she was born on August 27, 1961). Sometimes she goes grocery shopping and visits shopping centers. *Id.* at ¶ 56.

64. Plaintiff goes to and enjoys attending her children's activities. She has friends and attends social activities. *Id.* at ¶ 57.

65. During 2005, she traveled to Cincinnati for two weeks to assist her brother with home chores, such as cooking and cleaning (he was having surgery). She also took care of one of his two minor children. She did not need assistance to travel. *Id.* at ¶ 57.

66. Plaintiff takes medication without assistance. She usually makes her monthly mortgage and car loan payments herself. *Id.* at ¶ 58.

For the purpose of clarity, what follows is a timeline of the most relevant events that took place during Plaintiff's employment with the Defendant:

| DATE | EVENT |
| --- | --- |
| 2/1998 | Plaintiff began employment with the Company. |
| 11/2/1999 | Initial evaluation. Plaintiff warned of need to improve absenteeism. |
| 4/1/2000 | Promoted to Medical Account Manager |
| 8/6/2001–2/4/2002 (6 months) | Absences due to fibromyalgia |
| January 24, 2002 | Request for transfer denied |
| 8/8/2002–8/18/2002 (7 days) | Absences due to fibromyalgia |
| 8/19/2002–1/13/2003 (5 months) | Absences due to auto accident |
| 2/18/2003 | Warning (failed to meet the position's objectives; failure to file timely expense reports) |
| 2/24/2003–6/30/2003 (5 months) | Absences due to back condition |

| 6/2003 | Independent Consultant hired to assess reasonable measures to assist Plaintiff with back condition |
| --- | --- |
| 8/25/2003–8/27/2003 (3 days) | Absences due to back condition |
| 9/2/2003 | Warning (failed to meet the position's objectives) |
| 10/2/2003 | Castro filed administrative claim with Anti-discrimination Unit of the Puerto Rico Department of Labor and Human Resources. |
| 10/3/2003 | Plaintiff sent e-mail to supervisor claiming that she was disabled and that he was discriminating against her. |
| 10/30/2003–11/3/2003 (3 days) | Absences due to depression |
| 11/4/2003–12/1/2003 (1 month) | Absences due to depression |
| 11/10/2003 | P & G warned Plaintiff in writing of the need to provide proper documentation regarding absences or, otherwise, employment would be terminated. |
| 12/2003 | Request for transfer denied |
| 1/8/2004–1/21/2004 (10 days) | Absences due to chicken pox |
| 3/2/2004 | Plaintiff's suffered car accident and reported to SIF. |
| 2/16/2005 | Warning (failure to file timely expense reports since December 2003) |
| 3/4/2005 | Termination |
| 3/30/2005 | Plaintiff was released to work by the SIF. |

## II. SUMMARY JUDGMENT STANDARD

A motion for summary judgment is governed by Rule 56(c) of the Federal Rules of Civil Procedure, which allows disposition of a case if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Sands v. Ridefilm Corp.*, 212 F.3d 657, 660 (1st Cir.2000). A factual dispute is "genuine" if it could be resolved in favor of either party, and "material" if it potentially affects the outcome of the case. *Calero–Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir.2004).

To be successful in its attempt, the moving party must demonstrate the absence of a genuine issue as to any outcome-determinative fact in the record, *DeNovellis v. Shalala*, 124 F.3d 298, 306 (1st Cir.1997), through definite and competent evidence. *Maldonado–Denis v. Castillo–Rodriguez*, 23 F.3d 576, 581 (1st Cir.1994). Once the movant has averred that there is an absence of evidence to support the non-moving party's case, the burden shifts to the non-movant to establish the existence of at least one fact in issue that is both genuine and material. *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48 (1st Cir.1990) (citations omitted). If the non-movant generates uncertainty as to the true state of any material fact, the movant's efforts should be deemed unavailing. *Suarez v. Pueblo Int'l*, 229 F.3d 49, 53 (1st Cir.2000). Nonetheless, the mere existence of "some alleged factual dispute between the parties will not affect an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

At the summary judgment juncture, the Court must examine the facts in the light most favorable to the non-movant, indulging that party with all possible inferences to be derived from the facts. *See Rochester Ford Sales, Inc. v. Ford Motor Co.*, 287 F.3d 32, 38 (1st Cir.2002). The Court

must review the record "taken as a whole," and "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 135, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). This is so, because credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. *Id.*

## III. DISCUSSION

### A. Prima Facie Case of Disability Discrimination under ADA

In her complaint, Castro alleges she was discriminated against because of her disability, and was the victim of adverse employment actions on the part of her employer, namely, negative performance reviews and denied requests for transfers and changes in route. *See* Docket No. 6, ¶ 13. The Defendant now moves to dismiss Plaintiff's disability discrimination claim arguing that Plaintiff is not a qualified individual with a disability as defined by the ADA. *See* Docket No. 41.

"The ADA provides 'a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities.'" *Ruiz Rivera v. Pfizer Pharmaceuticals, LLC*, 521 F.3d 76, 82 (1st Cir.2008) (*citing Katz v. City Metal Co.*, 87 F.3d 26, 30 (1st Cir.1996)). Specifically, the ADA prohibits discrimination against "a qualified individual with a disability because of the disability of such individual in regard to ... terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

In the absence of direct evidence of discrimination, like in the case at hand, courts apply the burden-shifting framework first established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Gillen v. Fallon Ambulance Service, Inc.*, 283 F.3d 11, 29–30 (1st Cir.2002) (*citing Higgins v.*

*New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 264 (1st Cir.1999) (approving use of *McDonnell Douglas* framework in connection with ADA claims of disability discrimination)). Under that framework, the plaintiff first must establish a *prima facie* case of disability discrimination under the ADA by proving by a preponderance of the evidence: (a) that she was "disabled" within the meaning of the Act; (b) that she was able to perform, with or without reasonable accommodation, the essential functions of her job; and (c) that she was discharged or adversely affected, in whole or in part, because of her disability.

"If the plaintiff establishes a *prima facie* case, the burden then shifts to the defendant to 'articulate a legitimate, non-discriminatory reason for its employment decision and to produce credible evidence to show that the reason advanced was the real reason.'" *Freadman v. Metropolitan Property and Cas. Ins. Co.*, 484 F.3d 91, 99 (1st Cir.2007) (*citing Tobin v. Liberty Mut. Ins. Co.*, 433 F.3d 100, 105 (1st Cir. 2005)). "If the defendant offers a legitimate, non-discriminatory reason, the initial inference of discrimination evaporates, ..., and the burden then shifts back to the plaintiff to proffer evidence to establish that [the defendant's] non-discriminatory justification is mere pretext, cloaking discriminatory animus." *Freadman*, 484 F.3d at 99 (internal citations omitted). *See also Laurin v. Providence Hosp.*, 150 F.3d 52, 58 (1st Cir.1998) ("Plaintiff must muster proof that enables a factfinder rationally to conclude that the stated reason behind the adverse employment decision is not only a sham, but a sham intended to cover up the proscribed type of discrimination."). Notwithstanding, "[t]he ultimate burden of proving unlawful discrimination rests at all times with [Plaintiff]." *Tobin v. Liberty Mut. Ins. Co.*, 433 F.3d 100, 105 (1st Cir.2005).

### 1. "Disability" under ADA

"[T]he *sine qua non* requirement for ADA protection, is whether the individual has a 'disability' as defined by the ADA." *Corujo–Marti v. Triple–S, Inc.,* 519 F.Supp.2d 201, 212 (D.P.R.2007). Under the ADA, the term "disability" is defined as either: "(A) a physical or mental impairment which substantially limits one or more of an individual's major life activities; (B) a record of such impairment; or (C) being regarded as having such an impairment." *See* 42 U.S.C. § 12102(2); *see also* 29 C.F.R. § 1630.2(g). A plaintiff must at least satisfy one of the three alternative definitions. *See Corujo–Marti,* 519 F.Supp.2d at 212.

### a. Actual Disability

When considering statutory disability under subsection § 12102(2)(A), the Court of Appeals for the First Circuit has established a three-part analysis consisting of the following inquiries: (1) if the plaintiff suffered a physical or mental impairment; (2) if the "life activity" limited by the impairment qualify as "major"; and (3) if the impairment, in fact, substantially limits the plaintiff's identified major life activity. *See Carroll v. Xerox Corp.,* 294 F.3d 231, 238 (1st Cir.2005) (internal citations omitted). "The burden is on the plaintiff to establish these three elements." *Calero–Cerezo,* 355 F.3d at 20 (internal citations omitted).

In the case at hand, Plaintiff contends that she suffered from several physical and mental conditions that "substantially [limit] her in one or more of her daily living activities ...," *see* Docket No. 6, ¶ 7, namely: fibromyalgia, depression and other lesions (herniated disks, severe cervico-lumbar trauma, and others) stemming out of an automobile accident that occurred in August of 2002. In the motion for summary judgment now before the Court, Defendant contends that Plaintiff is not disabled within the meaning of ADA. Although Defendant does not challenge the fact that Castro suffered from physical and mental impairments during the relevant period, the Defendant argues that her impairments did not *substantially limit* any *major life activity.* Accordingly, the analysis that follows will focus on the last two of the three required inquiries: whether the impairments limit a major life activity and whether the limitation is substantial.

The United States Supreme Court has determined that the phrase "major life activities" refers to those activities that are of central importance to daily life. *See Toyota Motor Mfg., Ky., Inc. v. Williams,* 534 U.S. 184, 197, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002). The EEOC has defined the term to mean "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2. The First Circuit has also recognized lifting, sleeping, eating, thinking and concentrating as major life activities, and has assumed without deciding that work may constitute a major life activity. *See Calero–Cerezo,* 355 F.3d at 21; *Sullivan v. Neiman Marcus Group Inc.,* 358 F.3d 110, 115 (1st Cir.2004); *Gillen v. Fallon Ambulance Service, Inc.,* 283 F.3d 11, 21 (1st Cir.2002).

With regards to the term "substantially limits," the EEOC regulations define it as follows:

(i) Unable to perform a major life activity that the average person in the general population can perform; or (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general popu-

lation can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1). In applying this standard, a court must consider the nature and severity of the impairment, its expected duration, and its permanent or long-term impact. *See Gillen,* 283 F.3d at 21 (*citing* 29 C.F.R. § 1630.2(j)(2)).

When attempting to apply the foregoing standards to the case before the Court, we note that Castro has failed to specifically identify in her complaint what major life activities, if any, are substantially limited by her impairments. *See* Docket No. 6, ¶ 7. In her opposition, and for the first time in the proceedings, Castro identified the following "major life activities" as being substantially limited by her impairments: loss of concentration, cannot complete task, stiffness, difficult to interact, sexual disturbance, poor response to rela-

tions, among others. *See* Docket No. 50 at page 6. In support of her proposition, Castro attached a letter report by rheumatologist Dr. Jorge Mundo ("Dr. Mundo") as an exhibit to her opposition to the motion for summary judgment. *See* Exhibit 1, Docket No. 51. Plaintiff also relies on the report prepared by P & G's independent consultant to establish that lifting, pushing, pulling, and carrying any weight over 15 pounds were major life activities that were substantially limited by her impairment. *See* Docket No. 50 at page 7.

■ Defendant moves to strike Dr. Mundo's report on several grounds.[3] Dr. Mundo's letter report, dated June 14, 2005, is addressed "to whom it may concern" and states that, on September 14, 2001, Plaintiff Castro went to his office with a history of urinary incontinence, partial thyroidectomy, cervical pain, general fa-

---

**3.** P & G also moves to strike from the record Castro's medical files with physicians Dr. Jose Roman and Dr. Raymond Tasch. See Docket No. 62. According to Plaintiff in her opposition to the motion for summary judgment, these files were offered as evidence of the diagnoses of her physical and mental impairments. See Docket No. 50 at page 7. Because the fact that Castro suffered from physical and mental impairments is uncontested, this Court finds that, although redundant for the purpose for which they are offered, the medical files are properly authenticated by affidavit, see Docket No. 65, Exhibits No. 3 & 4, and shall NOT be stricken from the record. Accordingly, Defendant's motion to strike is **DENIED** with regards to Dr. Roman and Dr. Tasch's medical files.

The Defendant also requests that this Court strike from the record Castro's expert witness report prepared by psychiatrist Dr. Jose Villanueva because its content fails to comply with the principles of reliability and relevance set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). This Court **GRANTS** Defendant's motion to strike Plaintiff's expert report, albeit on different grounds. It has long been settled law that a plaintiff must

respond to an adequate motion for summary judgment with admissible evidence. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 159 n. 19, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). "Documents supporting or opposing summary judgment must be properly authenticated." *Carmona v. Toledo,* 215 F.3d 124, 131 (1st Cir.2000) (*citing* FED.R.CIV.P. Rule 56(e)). "The failure to authenticate a document properly precludes its consideration on a motion for summary judgment." *Robinson v. Bodoff,* 355 F.Supp.2d 578, 582 (D.Mass.2005) (striking all exhibits that were submitted without affidavits). To be admissible at the summary judgment stage, documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e). 10A WRIGHT, MILLER & KANE, FEDERAL PRACTICE & PROCEDURE § 2722 (3d ed.1998). After a careful review of the record, this Court finds that Plaintiff's expert report was submitted without an authenticating affidavit, and thus, it is inadmissible for the purposes of summary judgment. The Court also notes that, inasmuch as the Defendant's expert report by Dr. Raul E. Lopez suffers from the same defect, it is also not competent evidence for consideration in ruling on this motion for summary judgment. Consequently, both expert reports are hereby **STRICKEN** from the record.

tigue and hand pain. Dr. Mundo lists the following as his diagnosis: cervical myositis, fibromyositis, hypothyroidism, major depression with anxiety, and psoriasis, among other conditions. Dr. Mundo concludes in his report that Plaintiff has a "poor prognosis" and that her limitations include: stiffness, difficulty to interact, sexual disturbance, poor response to relations, loss of concentration, and inability to complete tasks. The report further states that "when you compare this limitation with the average population the quality of life is lost."[4] See Exhibit 1, Docket No. 51. Finally, according to Dr. Mundo, she was prescribed the following medications: Paxil (anti-depressant), Norflex (muscle relaxant), Viox (osteoarthritis), and Elavil.[5]

In its motion to strike, the Defendant first argues that the report does not state whether Dr. Mundo is her treating physician or if his conclusions simply stem from Plaintiff's only visit on September 14, 2001. Second, the Company proffers that the report is not a part of Plaintiff's medical record, and thus, is outside the scope of the type of testimony allowed for a non-expert treating physician. In addition, the Defendant attacks the probative value of the report arguing that it is devoid of any analytical foundation for the classifications, symptoms, and conclusions rendered. Accordingly, the Company requests that this report be stricken from the record. See Docket No. 62.

Plaintiff opposed the Defendant's request stating that Dr. Mundo is Castro's treating physician, that is, the rheumatologist called upon to treat her fibromyalgia, and that his views are founded on his treatment of Plaintiff. In support of her contention, Plaintiff attached to her opposition to the motion to strike a sworn statement from Dr. Mundo in which he asserts that Castro is his patient and that he has "treated Mrs. Castro in the usual course of [his] medical practice." See Exhibit No. 2, Docket No. 65. Therein, he affirms that the content of the report stems from his interventions with Castro. Plaintiff also argues that pursuant to Zarecki v. National Railroad Passenger Corp., 914 F.Supp. 1566 (N.D.Ill.1996), a treating physician is not required to submit an expert report, if testifying as to his/her care and treatment of patient. In addition, because Dr. Mundo's testimony establishes that Plaintiff has a "record of" her conditions, the report establishes "this alternate definitional prong under the ADA." See Docket No. 65. Let's see.

Regarding the role of treating physicians as witnesses, the United States Court of Appeals for the First Circuit has held that a treating physician is the sort of witness who may have specialized knowledge, yet need not be considered an expert for the purpose of submitting a report as part of pretrial discovery. Gomez v. Rivera Rodriguez, 344 F.3d 103, 113 (1st Cir. 2003). "[A] treating physician, testifying as to his consultation with or treatment of a patient, is not an expert witness for purposes of Rule 26 [of the Federal Rules of Civil Procedure]." Id. Additionally, in Gonzalez v. Executive Airlines, Inc., 236 F.R.D. 73, 78 (D.P.R.2006) (Pieras, J.), this District held that "[b]ecause treating physicians are generally presented to provide testimony arising from their roles as actors in the events giving rise to the litigation, they are treated as fact witnesses and are not subject to the more stringent re-

---

**4.** Dr. Mundo does not, however, specify what limitation he is referring to.

**5.** From Dr. Mundo's report, this Court is unable to ascertain whether Castro was prescribed these medications on September 14, 2001, or if she was being prescribed these medications recurrently.

quirements that Rule 26 creates for expert witnesses...." *Gonzalez*, 236 F.R.D. at 78.

Notwithstanding the foregoing, this District also held in *Gonzalez* that the difference between a fact witness and an expert "lies in the nature of the witness's involvement in the case and the nature of the testimony the parties intend for the witness to proffer." *Gonzalez*, 236 F.R.D. at 78. This predicament requires close analysis, *id.* at 81, the essential point of which is the essence of the proffered testimony, *id.* at 78 (*citing Gomez*, 344 F.3d at 113). Therefore, for a treating physician not to be bound by the expert witness requirements of Rule 26, the physician's testimony must be closely constrained to the facts of the treatment administered and discussed in his notes taken at the time of his examination. *Gonzalez*, 236 F.R.D. at 78. Citing the analysis utilized by a sister court, the *Gonzalez* Court held that:

> [t]o the extent that the treating physician testifies only as to the care and treatment of his/her patient, the physician is not to be considered a specially retained expert notwithstanding that the witness may offer opinion testimony under Federal Rules of Evidence 702, 703 and 705. However, when the physician's proposed opinion testimony extends beyond the facts made known to him during the course of the care and treatment of the patient and the witness is specially retained to develop specific opinion testimony, he becomes subject to the provisions of Federal Rule of Civil Procedure 26(a)(2)(B). The determinative issue is the scope of the proposed testimony.

*Id.* (*citing Wreath v. U.S.*, 161 F.R.D. 448, 450 (D.Kan.1995)).

Based on the preceding discussion, Senior District Judge for this District, Hon. Jaime Pieras, concluded that two reports written by the plaintiff's treating physi-cians had to be stricken from the record. Judge Pieras noted that these reports were written after the filing of the complaint, were written in letter form (addressed "To Whom It May Concern"), and were not a proper part of the plaintiff's medical record. Instead, they appeared to have been composed for the purposes of the litigation, "which place[d] them outside the scope of testimony arising from the treatment of the Plaintiff." *Gonzalez*, 236 F.R.D. at 82. Having been prepared as part of the litigation, the Court found that they had nothing to do with the treatment of the plaintiff in *Gonzalez*, and instead, "[gave] rise to the impression that they [were] after thought notes from the treating physician and the therapist." *Id.* at 83. Finally, the Court concluded that "the proper vehicle for the disclosure of that information [was] through interrogatories and depositions...." *Id.* Per the foregoing, the contents of the reports were found to be "outside the scope of their treatment of the [p]laintiff." *Id.*

Much like in *Gonzalez*, the letter report attached to Castro's opposition to the motion for summary judgment is addressed "to whom it may concern," is dated after the filing of the above-captioned claim, and is certainly not a part of her medical record. Therefore, in the absence of contrary binding authority, and in light of the similarity between the evidentiary issues presented herein and in *Gonzalez*, the undersigned finds it appropriate to defer to Hon. Judge Piera's opinion on the matter.

■ In addition, we share the opinion of several sister courts that a treating physician not identified as an expert shall not "be allowed to testify about plaintiff's current condition, prognosis, causation or permanency, and any other such forward-looking speculation, or other conclusion reached with the benefit of hindsight and after the underlying events that gave rise

to [the] lawsuit." *Bynum v. MVM, Inc.*, 241 F.R.D. 52, 54 (D.D.C.2007). *See also Calhoun v. Klingensmith Healthcare, Inc.*, No. 07–86, 2007 WL 4205818 (W.D.Pa. November 27, 2007). That is exactly what Dr. Mundo's report purports to do, and it will not be allowed.

Finally, to the foregoing analysis, this Court must add that in her opposition to the motion to strike, Plaintiff cites *Patten v. Wal–Mart Stores East, Inc.*, 2001 WL 631258, at *5 (D.Me., June 07, 2001), which stands for the proposition that an affidavit of a treating physician stating that "[t]hroughout the time that I have treated [plaintiff], her [disease] has rendered her substantially limited in her ability to walk and run. She has been significantly limited in her ability to walk and run if compared to an adult who does not have [the disease] with otherwise similar attributes to [plaintiff]," meets a plaintiff's *prima facie* burden of establishing that the existence of a disability. Unfortunately for Plaintiff in this case, her treating physician's report and affidavit fall short of this standard. Dr. Mundo simply proffers that, when compared with the average population, her "quality of life is lost." *See* Exhibit 1, Docket No. 51. As far as this Court is concerned, quality of life is not a major life activity.[6] Thus, in light of all the above, the undersigned finds that Cas-

tro's treating physician report is outside the scope of his treatment of Plaintiff, and thus, Defendant's request to strike Dr. Mundo's letter report is hereby **GRANTED**.[7]

Now, moving on to the analysis of whether Plaintiff suffers from an actual disability, "[i]t is well established that the determination of whether a plaintiff has a disability must be made on a case-by-case basis." *Calero–Cerezo*, 355 F.3d at 20 (*citing Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 198, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002); *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 483, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999)). "It is insufficient for individuals attempting to prove disability status ... to merely submit evidence of a medical diagnosis of an impairment." *Toyota Motor*, 534 U.S. at 198, 122 S.Ct. 681. Rather, those seeking the Act's protection must "prove a disability by offering evidence that the extent of the limitation [caused by their impairment] in terms of their own experience ... is substantial." *Id.* (*citing Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 567, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999)). Moreover, "[a]n individualized assessment of the effect of an impairment is particularly necessary when the impairment is one whose symptoms vary widely from

---

**6.** If anything, Dr. Mundo's statements place Plaintiff in a conundrum. In his sworn report, Castro's treating physician asserts that she has difficulty interacting, concentrating and completing tasks. Inasmuch as this is in fact the case, she may have a difficult time establishing one of the prongs of her disability discrimination claim: that she is able to perform the essential functions of her job, either with or without reasonable accommodation.

**7.** Even assuming *arguendo* that Dr. Mundo's report was not stricken from the record, this Court finds that a physician's conclusory assertion of disability that lacks elaboration and support in the record is not sufficient to make the required individualized showing of a

plaintiff's particular limitations. *See Ruiz Rivera v. Pfizer Pharmaceutical LLC*, 463 F.Supp.2d 163, 171 (D.P.R.2006) (*citing Gonzalez v. El Dia, Inc.*, 304 F.3d 63, 74 (1st Cir.2002) ("testimony presented by the treating physician [was] highly conclusory")), aff'd, 521 F.3d 76 (1st Cir.2008). *See also Calef v. Gillette Co.*, 322 F.3d 75 (1st Cir.2003) (when attempting to prove disability status, the Supreme Court in *Toyota Motor Mfg.* has recently required more analysis than a doctor's conclusory opinion). Therefore, Plaintiff's absolute reliance on Dr. Mundo's report, or any other physician's report, is inapposite according to the applicable law.

person to person." *Toyota Motor Mfg.*, 534 U.S. at 199, 122 S.Ct. 681. This individualized assessment is particularly necessary in the case at hand in light of Plaintiff's fibromyalgia and depression diagnoses. *See Labrecque v. Sodexho USA, Inc.*, 287 F.Supp.2d 100 (D.Mass.2003) (holding that the legal analysis under ADA is rendered complex by the fact that fibromyalgia is highly individualized in its manifestations); *Cassimy v. Board of Educ. of Rockford Public Schools*, 461 F.3d 932 (7th Cir.2006) (holding that whether depression gives rise to a substantial limitation on a major life activity for purposes of ADA depends on its severity).

██ In the case at hand, Plaintiff argues that her status as a disabled individual is conclusively evidenced by the reports prepared by her physicians and the Company's independent consultant.[8] Her reliance, as previously stated, is misguided. And although Plaintiff asserts that she has some difficulty sitting and driving for extended periods, lifting heavy objects, and getting out of bed sometimes, the record also reveals—as per Plaintiff's own admissions in her deposition—that she is able to drive, go grocery shopping, visit shopping centers, take care of herself, clean herself, cook, garden, occasionally dance, do house chores, smoke a pack of cigarettes daily,

and attend her children's activities and other social events. She was even able to travel without assistance to Cincinnati for two weeks to help her brother with home chores, such as cooking and cleaning, and taking care of his children, while he recuperated from surgery. *See* Findings of Fact, Section I, *infra*, ¶¶ 62–66.

In light of the record of this case, we find that Castro has made "little effort ... to establish that [her] impairment [s] substantially [limit] one or more of [her] major life activities." *Rolland v. Potter*, 492 F.3d 45, 49 (1st Cir.2007).[9] "[I]n general, unsupported self-serving statements by the plaintiff regarding the severity of a disability are insufficient to carry the day against a motion for summary judgment in an ADA case." *Labrecque*, 287 F.Supp.2d at 109.[10] And although "Plaintiff has presented limited evidence that [she] cannot lift heavy objects, ..., this alone is insufficient. [She] has not brought forth any other medical documentation that established [her] limitations to lift, to wit, the maximum weight [she] can lift." *Velez Del Valle v. Paints*, 349 F.Supp.2d 219, 227–228 (D.P.R.2004) (finding that case law holding that restrictions on heavy lifting, by themselves, are not indicative of a disability is extensive).[11]

---

8. With regards to the Company's independent consultant's report, the Court notes that its conclusions are based on Plaintiff's own testimony. *See* Docket No. 42, Exhibit 32 at page 1 ("Mrs. Castro provided verbal information on her medical and personal status.") Therein, the independent consultant stated that she informed him that she is unable to lift, push, pull, or carry any weight over 15 lbs. *See id.* at page 2.

9. *See also Miller v. Ameritech Corp.*, 214 Fed. Appx. 605, 608–609 (7th Cir.2007) ("To survive summary judgment, a plaintiff must provide specific facts as to whether he is substantially limited in a major life activity ... conclusory allegations will not do.").

10. *See also Burks v. Wisconsin Dept. of Transp.*, 464 F.3d 744, 756 (7th Cir.2006) ("bald and self-serving assertions in affidavits, unsubstantiated by any documentation or other testimony, are not sufficient to create a material issue of fact as to whether an impairment has substantially limited a major life activity.")

11. *See also Soler v. Tyco Electronics, Inc.*, 268 F.Supp.2d 97, 107 (D.P.R.2003) (holding that impairment has not substantially limited the major life activity of lifting where an individual could clean his dishes, clean the yard, bathe his dog, do the groceries, take out the garbage, and prepare his own meals); *Ortiz–Molina v. MAI Del Caribe, Inc.*, 83 F.Supp.2d

In sum, Castro's testimony fails to identify, in terms of her own experience, any major life activity in which she is substantially limited. "She therefore has failed to demonstrate that she is disabled within the meaning of the [statute]." *See Robbins v. American Preferred Management Co., Inc.*, No. 5:05–CV–182, 2007 WL 2728746, at *8 (W.D.Mich. September 17, 2007) (plaintiff's own deposition testimony fails to establish disability under ADA). *See also Corujo–Marti*, 519 F.Supp.2d 201 (D.P.R.2007).

■ Finally, this Court notes that additional grounds exist to support our conclusion that Castor has not established that her medical conditions substantially limited a major life activity: Castro's failure to identify in her complaint a specific major life activity which was substantially limited by her impairments. An ADA claimant must specify which major life activity has been limited and only those grounds specifically raised will be considered by this court. *See Martin v. Discount Smoke Shop, Inc.*, 443 F.Supp.2d 981 (C.D.Ill. 2006) (*citing Sinkler v. Midwest Property Management Ltd. Partnership*, 209 F.3d 678, 683 (7th Cir.2000)).

> It is one matter that the Court must analyze the factual scenario in this case construing the facts, the record, and all reasonable inferences in the light most favorable to the party opposing summary judgment.... Another is to allow the Plaintiff to bring forth new never raised allegations, and previously unmentioned major life activities that have been allegedly affected. The Court is not obliged to search the record, where Plaintiff failed to request to amend the complaint, in order to set forth those new allegations, and theories.

*See Alamo Rodriguez v. Pfizer Pharmaceuticals, Inc.*, 286 F.Supp.2d 144, 152 (D.P.R.2003) (internal omissions omitted). *See also Rivera–Mercado v. Scotiabank De Puerto Rico–Intern.*, No. 06–1018(JAG), 571 F.Supp.2d 279, 2008 WL 660088 (D.P.R. March 06, 2008); *Corujo–Marti*, 519 F.Supp.2d 201 (D.P.R.2007); *Pagan–Duran v. Ramirez–Rangel*, No. 04–1668(ADC), 2007 WL 1056719 (D.P.R. 2007); *Davila Rivera v. Caribbean Refrescos, Inc.*, No. 02–2499(DRD), 2004 WL 1925477, at *8 (D.P.R. May 26, 2004) (holding that plaintiff's attempt to amend her allegations through opposition would not be allowed inasmuch as complaint did not identify any major life activity that had been jeopardized due to her alleged mental impairment).

In our view, Plaintiffs omission is fatal to her claim of disability, and thus, this Court will not allow Plaintiff to attempt to amend her allegations through her opposition to Defendant's motion for summary judgment.

### b. "Record of" a disability

■ The second category of disability under 42 U.S.C. § 12102(2)(B) covers those having a record of a mental or physical impairment that substantially limits one or more major life activities. *See* 42 U.S.C. § 12102(2)(B). To have a record of such an impairment, a plaintiff must have a history of, or been misclassified as having, a mental or physical impairment that substantially limited a major life activity. *See* 29 C.F.R. § 1630.2(k).

"[T]he recorded impairment must be one that substantially limited a major life activity." *Santiago Clemente v. Executive Airlines, Inc.*, 213 F.3d 25, 33 (1st Cir.2000) (*citing Sorensen v. University of Utah*

---

271, 277 (D.P.R.2000) (finding that for a lifting limit to constitute disability under the ADA, it must be a severe, permanent restriction that substantially limits the employee/plaintiff's ability to lift and reach "in general").

*Hosp.*, 194 F.3d 1084, 1087 (10th Cir.1999); *Hilburn v. Murata Elec. North Am., Inc.*, 181 F.3d 1220, 1229 (11th Cir.1999)). *See also Bailey v. Georgia–Pacific Corp.*, 306 F.3d 1162 (1st Cir.2002) ("A record or history of an impairment is not sufficient to show disability; the record must be of an impairment [that] substantially limited a major life activity."); *Dupre v. Charter Behavioral Health Sys. of Lafayette, Inc.*, 242 F.3d 610, 615 (5th Cir.2001) ("[N]ot only must [Plaintiff] demonstrate that she has a record of an injury or impairment, but the evidence must show that her impairment limited a major life activity.").

"Furthermore, to successfully establish an ADA claim the employer, in making the employment decision, must rely on the record indicating that the plaintiff has or had a substantially limiting impairment." *Rivera–Mercado v. Scotiabank De Puerto Rico–Intern.*, Civil No. 06–1018(JAG), 571 F.Supp.2d 279, 287, 2008 WL 660088, at *5 (D.P.R. March 06, 2008) (internal citations omitted).

In its motion for summary judgment, P & G argues that Plaintiff has failed to make out a claim of discrimination under the "record of" prong of the definition of disability because no such record of an impairment that substantially limited any of Plaintiff's major life activity exists. *See* Docket No. 41 at page 8. In her opposition, Castro simply states that she satisfies the "record of" prong of the covered disability definition under the ADA because she was diagnosed with fibromyalgia, and she has been under treatment for this condition. *See* Docket No. 50 at page 8.

Although the record shows that the Defendant was aware of Castro's impairments, Plaintiff does not adduce to any record that indicates whether or how these conditions substantially limited any major life activity. "Mere knowledge of an impairment does not create a record of an impairment." *Rivera–Mercado,* 571 F.Supp.2d at 287, 2008 WL 660088 at *6 (*citing Taylor v. Nimock's Oil Co.,* 214 F.3d 957, 961 (8th Cir.2000)). Accordingly, Castro has not advanced sufficient evidence to satisfy subpart (B) of 42 U.S.C. § 12102(2), and thus. Plaintiff's evidence cannot create a genuine dispute of fact on this issue.

### c. "Regarded as" having a disability

██ Castro alleges in her complaint that P & G regarded her as disabled pursuant to subpart (C) of § 12102(2), which provides that having a disability includes being regarded as having a physical or mental impairment that substantially limits one or more of the major life activities. *See* 42 U.S.C. § 12102(2)(C).

The "regarded as" prong of the Act "exists to cover those cases in which myths, fears and stereotypes affect the employer's treatment of an individual, because Congress has recognized that society's accumulated myths and fears about disability and disease are as handicapping as are the physical limitations that flow from actual impairment." *Ruiz Rivera,* 521 F.3d at 82–83. In *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999), the Supreme Court observed that:

[t]here are two apparent ways in which individuals may fall within this statutory definition: (1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities. In both cases, it is necessary that a covered entity entertain misperceptions about the individual—it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially

limiting impairment when, in fact, the impairment is not so limiting. These misperceptions often resul[t] from stereotypic assumptions not truly indicative of . . . individual ability.

*Sutton,* 527 U.S. at 489, 119 S.Ct. 2139.

■■■ "A plaintiff claiming that [she] is 'regarded' as disabled cannot merely show that [her] employer perceived [her] as somehow disabled; rather, [she] must prove that the employer regarded [her] as disabled within the meaning of the ADA." *Bailey,* 306 F.3d at 1169 (*citing Giordano v. City of N.Y.,* 274 F.3d 740, 748 (2d Cir.2001)). In addition, "[u]nder the ADA, the mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate either that the employer regarded the employee as disabled or that the perception caused the adverse employment action." *Rivera–Mercado,* 571 F.Supp.2d at 287, 2008 WL 660088 at *6.

In her complaint, Castro asserts, without more, that her former employer regarded her as being substantially limited in a major life activity, *see* Docket No. 6 at ¶ 7, but to her detriment, failed to identify which major life activity her employer perceived her as being substantially limited to perform. The Supreme Court in *Sutton* "has implied that regarded as claims under the ADA require an even greater level of specificity than other claims." *Ruiz Rivera,* 521 F.3d at 84 (*citing Sutton,* 527 U.S. at 489–91, 119 S.Ct. 2139). "In order to allege an actionable regarded as claim, a plaintiff must select and identify the major life activity that she will attempt to prove the employer regarded as being substantially limited by her impairment." *Ruiz Rivera,* 521 F.3d at 84. "It simply will not do for a plaintiff to fail to plead with adequate specificity facts to support a regarded as claim, all-the-while hoping to play that card if her initial hand [her actual disability claim] is a dud." *Id.* at 85 (internal citations omitted). Therefore, "with no facts alleged to explain any false perception on [defendant's] part, and no facts alluding to any non-limiting impairment which [defendant] mistakenly believed to be substantially limiting, this allusion falls far short of the mark." *Id.* at 84.[12]

Regardless of Plaintiff's failure to properly allege her "regarded as" disability claim, we also find that Plaintiff's contention to that effect lacks merit. In her opposition. Plaintiff points to the following to substantiate her claim that the Defendant regarded her as having an impairment that substantially limited major life activities: (1) P & G's indication in her performance reviews that absences due to her disability had impacted the outcome of

---

**12.** Even if we assumed, for purposes of the instant discussion, that working is the life activity that Plaintiff was regarded as being substantially limited in, her claim would fail. When working is the major life activity at issue, a plaintiff must show not only that the employer thought that she was impaired in her ability to do the job that she held, but also that the employer regarded her as substantially impaired in either a class of jobs or a broad range of jobs in various classes as compared with the average person having comparable training, skills, and abilities. *See Ruiz Rivera,* 521 F.3d at 83 (*citing Sullivan v. Neiman Marcus,* 358 F.3d 110, 117 (1st Cir.2004)). *See also Bailey v. Georgia–Pacific Corp.,* 306 F.3d 1162, 1169–1170 (1st Cir.2002). Here, the evidence shows that P & G was aware of Plaintiff's impairments and believed, at most, that Castro was unable to meet some of the requirements of her particular job. "Since [Plaintiff] adduces no evidence that [her] employer thought [she] was unfit for either a class or a broad range of jobs, [her] 'regarded as' claim of disability must fail." *Bailey,* 306 F.3d at 1170 (*citing Murphy v. United Parcel Serv., Inc.,* 527 U.S. 516, 524, 119 S.Ct. 2133, 144 L.Ed.2d 484 (1999) (concluding that summary judgment is proper where ADA plaintiff fails to show that he is "regarded as unable to perform a class of jobs")).

the evaluations; (2) the hiring of an independent consultant on reasonable accommodation to deal with Castro's restrictions; and, (3) the fact that Defendant granted and recognized numerous leave of absences without questioning them. *See* Docket No. 50 at page 10. We disagree.

First of all, Castro's performance evaluation reveal that the Defendant was aware of her health problems, and while the Defendant may have perceived that Plaintiff's health problems were adversely affecting her job performance, there is no evidence that P & G regarded Castro as being unable to care for herself or to perform all of the duties of her job. *See Kocsis v. Multi–Care Management, Inc.,* 97 F.3d 876 (6th Cir.1996) ("While the defendant may have perceived that Kocsis' health problems were adversely affecting her job performance, there is no evidence that defendant regarded Kocsis as being unable to care for herself or to perform all of the duties of her job. Therefore, Kocsis cannot establish that she had a disability under the "regarded as" prong of the definition.").

■ Second, the fact that the Defendant allowed her to take medical leaves of absences and hired an independent consultant to recommend reasonable accommodations that would assist Castro in the performance of her duties does not support her claim either. To hold that an employer perceives a distressed employee as disabled under the ADA by making an offer to accommodate such an employee would unnecessarily inhibit employers from assisting their employees. *See Marlon v. Western New England College,* 124

Fed.Appx. 15 (1st Cir.2005) (holding that evidence that defendant provided plaintiff with certain accommodations for her condition was insufficient to establish that defendant regarded her as disabled for purposes of ADA, absent showing that the defendant maintained any *misperceptions* about her condition).[13]

> [W]hen an employer takes steps to accommodate an employee's restrictions, it is not thereby conceding that the employee is disabled under the ADA or that it regards the employee as disabled. A contrary rule would discourage the amicable resolution of numerous employment disputes and needlessly force parties into expensive and time-consuming litigation.

*Thornton v. McClatchy Newspapers, Inc.,* 261 F.3d 789, 798 (9th Cir.2001).

At any rate, the record reflects that when the independent consultant was hired, Plaintiff had been on medical leave for approximately five (5) months due to a back condition, and that she informed the consultant that her physicians had imposed some lifting restrictions. *See* Docket No. 42, Exhibit I. Plaintiff now cannot rely on her employer's implementation of the lifting restrictions allegedly imposed by her own physician to establish a regarded as claim. *See Ruiz Rivera,* 521 F.3d at 86 (*citing Breitkreutz v. Cambrex Charles City, Inc.,* 450 F.3d 780, 783 (8th Cir.2006) ("If a restriction is based upon the recommendations of physicians, then it is not based upon myths or stereotypes about the disabled and does not establish a perception of disability.")).

---

**13.** *See also Olivieri v. Abbot Laboratories,* Civil No. 05–1244(ADC), 2008 WL 747082 (D.P.R. March 19, 2008) (evidence that employer was aware of plaintiff's condition, viewed her as unable to meet certain essential requirements of her job and even offered accommodations is insufficient to establish claim that defendant regarded plaintiff as disabled under ADA, inasmuch as the record is void of any evidence that defendant viewed plaintiff as unfit to perform a broad range of jobs).

In light of the foregoing analysis, this Court finds that Castro's "regarded as" claim fails on both procedural and substantive grounds.

## 2. Qualified Individual

 The ADA defines a "qualified individual with a disability" as follows:

> [A]n individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.

42 U.S.C.A. § 12111(8). In order to be a "qualified individual" under ADA, "the burden is on the employee to show: first, that she possesses the requisite skill, experience, education and other job-related requirements for the position, and second, that she is able to perform the essential functions of the position with or without reasonable accommodation." *Garcia–Ayala v. Lederle Parenterals, Inc.*, 212 F.3d 638, 646 (1st Cir.2000) (internal citations and quotation marks omitted).[14] In the case at hand, there is no question as to the first of these two requirements.

The EEOC guidelines define the term "essential functions" as "the fundamental job duties of the employment position the individual with a disability holds or desires." 29 C.F.R. § 1630.2(n)(1). The term, however, does not include the marginal functions of the position. *Id.* The regulations cite the following three reasons for classifying a task as an essential function:

> (i) The function may be essential because the reason the position exists is to perform that function;

> (ii) The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or

> (iii) The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.

*Id.* at § 1630.2(n)(2)(i)-(iii).

For the purposes of ADA, consideration is given to the employer's judgment as to what functions of a job are essential. *See* 42 U.S.C. § 12111(8). Notwithstanding, "Courts take into consideration factors other than the employer's determination of the essential functions of the job not 'to second-guess legitimate business judgments, but, rather, to ensure that an employer's asserted requirements are solidly anchored in the realities of the workplace, not constructed out of whole cloth.'" *Pagan–Duran*, 2007 WL 1056719 at *18. *See also Calef*, 322 F.3d at 86 n. 8 ("The inquiry into essential functions is not intended to second-guess an employer's business judgment regarding production standards.")

In its motion for summary judgment, P & G argues that Plaintiff is not a qualified individual since she was unable to perform an essential duty of her job, namely, regular attendance. From what this Court is able to make out of Plaintiff's opposition, Castro apparently attempts to argue that she was a qualified individual who was able to perform the essential functions of her job had a reasonable accommodation been provided by the Defendant: additional medical leaves of absence. *See* Docket No.

---

**14.** The EEOC guidelines have defined the term "qualified individual with a disability" as "an individual with a disability who satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires, *and* who, with or without reasonable accommodation, can perform the essential functions of such position." 29 C.F.R. § 1630.2 (emphasis ours).

50 at pages 23–26. Assuming *arguendo* that Castro adduced evidence from which a rational jury could have found that her physical and mental impairments constituted a "disability" under the ADA, we agree with the Defendant's contention that Plaintiff was not a qualified individual under ADA.

■ "It is well settled that an employer need not accommodate a disability by foregoing an 'essential function' of the employment position." *Laurin v. Providence Hosp.*, 150 F.3d 52, 56 (1st Cir.1998) (internal citations omitted). "An employer may base a decision that the employee cannot perform an essential function on an employee's actual limitations, even when those limitations result from a disability." *Calef v. Gillette Co.*, 322 F.3d 75, 86 (1st Cir.2003) (citing *Leary v. Dalton*, 58 F.3d 748, 753–54 (1st Cir.1995)). In fact, "[i]f the plaintiff, with or without reasonable accommodation, cannot perform an essential function of the job, then he is not a qualified individual and there is no duty to accommodate." *Calef*, 322 F.3d at 86 n. 8.

The First Circuit recently held that "attendance is an essential function of any job." *Rios–Jimenez v. Principi*, 520 F.3d 31, 42 (1st Cir.2008) (holding that employee who frequently missed work was not a qualified individual able to perform the essential functions of her job, either with or without a reasonable accommodation, as required to support disability discrimination and reasonable accommodation claims under the Rehabilitation Act). *See also Leary v. Dalton*, 58 F.3d 748 (1st Cir.1995) (under Rehabilitation Act, employee with excessive absences related to claimed disability was not qualified individual). "Gross attendance problems can prevent a disabled person from being qualified for a position even when the attendance problem is related in whole or in part to the disability." 1 H.H. PERRITT, JR., AMERICANS WITH DISABILITIES ACT HANDBOOK, § 3.06[E] at 124 (4th ed.2003). In fact, "[n]umerous federal courts have held that disabled employees cannot establish that they can sufficiently perform the essential functions of a job without showing they can maintain a regular and reliable level of attendance at that job." *Kennedy v. Applause, Inc.*, No. CV 94–5344 SVW(GHKX), 1994 WL 740765 (C.D.Cal. December 6, 1994) (holding that inability to maintain regular and reliable level of attendance defeated plaintiff's qualification for the job).[15]

---

**15.** *See also Jackson v. Veterans Admin.*, 22 F.3d 277, 278–79 (11th Cir.1994) (an employee with numerous sporadic absences was not "otherwise qualified" under the Rehabilitation Act); *Tyndall v. National Educ. Ctrs.*, 31 F.3d 209, 213 (4th Cir.1994) ("[A]n employee must be willing and able to demonstrate, [for the purposes of an ADA claim, the skills necessary to perform the job in question] by coming to work on a regular basis"); *Carr v. Reno*, 23 F.3d 525, 529 (D.C.Cir.1994) (holding that "coming to work regularly" is an "essential function"); *Law v. United States Postal Serv.*, 852 F.2d 1278, 1279–80 (Fed.Cir. 1988) (holding that attendance is a minimum function of any job); *Beauford v. Father Flanagan's Boys' Home*, 831 F.2d 768, 771 (8th Cir.1987) (because plaintiff conceded total disability and therefore was unable to perform essential functions of her job, the Court held she did not meet the prerequisites for protection under the provisions of the Rehabilitation Act); *EEOC v. AIC Sec. Investigation*, 820 F.Supp. 1060, 1064 (N.D.Ill.1993) (for the purposes of an ADA claim, "attendance is necessary to any job ..."); *Walders v. Garrett*, 765 F.Supp. 303, 309 (E.D.Va.1991) (granting summary judgment on Rehabilitation Act claim for the employer because the plaintiff could not work due to her Chronic Fatigue Syndrome; "[f]ew would dispute that, in general, employees cannot perform their job successfully without meeting some threshold of both attendance and regularity"), aff'd, 956 F.2d 1163 (4th Cir.1992); *Santiago v. Temple University*, 739 F.Supp. 974, 979 (E.D.Pa.1990) ("[A]ttendance is necessarily the fundamental prerequisite to job qualification"), aff'd, 928 F.2d 396 (3d Cir.1991); *Wimbley v. Bolger*, 642 F.Supp. 481, 485

It is undisputed that P & G's Medical Account Managers are required to visit at least 9 physicians a day (9 "calls" a day). *See* Findings of Fact, Section I, *infra,* ¶ 11. Therefore, it was a reality of her workplace that regular attendance was an essential function of the position she held at P & G. It is also uncontroverted that from the time of her promotion to Medical Account Manager in August of 2001 until her termination on March 4, 2005—a time span of three (3) years and seven (7) months—Castro was absent for approximately 878 days (the equivalent of 2 years and 5 months or 67% of the time). *See* Findings of Fact, Section I, *infra,* ¶ 40–41.

Even if her absenteeism was tied to her illness, the "[i]nability to work for a multi-month period removes a person from the class protected by the ADA." *Byrne v. Avon Products, Inc.,* 328 F.3d 379, 381 (7th Cir.2003). *See also Perkins v. Ameritech Corp.,* 161 Fed.Appx. 578 (7th Cir. 2006) (affirming summary judgment dismissing ADA claims of former employee that suffered depression, anxiety and fibromyalgia because her failure to appear regularly for work removed her from the class of "qualified individuals" protected by the ADA). Simply put, "one who does not come to work cannot perform any of his job functions, essential or otherwise." *Wimbley v. Bolger,* 642 F.Supp. 481 (W.D.Tenn.1986), *aff'd,* 831 F.2d 298 (6th Cir.1987). Consequently, even examining the facts in the light most favorable to Plaintiff, we find that she has failed to establish that she could perform her essential job functions.

In her opposition, Plaintiff claims she would have been a qualified individual if P & G had reasonably accommodated her disabilities. Castro argues that pursuant to the ADA, reasonable accommodations may include "job restructuring, part-time or modified work schedules, . . . and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(B). Castro states that "[t]he main accommodation needed . . . was leave of absence for treatment." *See* Docket No. 50 at page 23. Although Plaintiff concedes that P & G allowed her to take numerous leaves of absences for the diagnosis and treatment of her medical conditions, she claims that she was denied the opportunity to attend a medical appointment at the SIF that was scheduled on March 30, 2005, twenty-six days after her termination. However, the Court notes that when she was terminated, Plaintiff had not been cleared to work by the SIF, provided her employer with an expected release date, or requested to return to work. It is not until her April 4, 2005 letter that she requested the Company to be reinstated.

In light of the uncontested facts of this case, we find that "[t]he problem with [plaintiff's] contention is that prior to receiving a notice of termination [plaintiff] never advised [defendant] she needed additional accommodation, much less what accommodation . . . was needed. In general, it is the responsibility of the individual with the disability to inform the employer that an accommodation is needed." *Mole v. Buckhorn Rubber Products, Inc.,* 165 F.3d 1212, 1217 (8th Cir.1999) (internal citations and quotation marks omitted). "[Plaintiff] cannot expect the employer to read her mind and know she secretly wanted a particular accommodation and then sue the employer for not providing it." *Id.* at 1218. Accordingly, Plaintiff's failure to evince that she requested additional medical leave is fatal to her claim.

(W.D.Tenn.1986) (An employee who "does not come to work cannot perform any of his job functions, essential or otherwise"), aff'd, 831 F.2d 298 (6th Cir.1987).

Even examining the facts in the light most favorable to Castro, we find that she is unable to establish the second prong of her *prima facie* case: that she was a qualified individual able to perform the essential functions of her job, either with or without a reasonable accommodation.

### 3. Adverse Employment Action

The third element a plaintiff must prove to establish a *prima facie* case of disability discrimination under the ADA is that she was adversely affected, in whole or in part, because of her disability. The First Circuit has held that "[t]o be adverse, an action must materially change the conditions of plaintiffs' employ." *Gu v. Boston Police Dept.*, 312 F.3d 6, 14 (1st Cir.2002). "Material changes include 'demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations, and toleration of harassment by other employees.'" *Id.* (*citing Hernández–Torres v. Intercontinental Trading, Inc.*, 158 F.3d 43, 47 (1st Cir. 1998)).

 Castro claims that the negative performance reviews she received from her former employer, P & G, were discriminatory.[16] The record in this case reveals that on February 18, 2003 and on September 2, 2003, Plaintiff was advised of several deficiencies in her performance. Specifically, she was warned of her failure to meet the Medical Account Manager position's call objectives and to submit timely expense reports. Thereafter, on February 16, 2005, she was once again warned that her failure to timely submit the required expense reports resulted in the cancellation of her corporate credit card and the accumulation of overdue amounts and delinquency charges. When she received this warning, Plaintiff was on medical leave with the SIF. In her opposition, Castro does not dispute the setbacks in her performance. On the contrary, the record reflects that the Defendant's warnings and performance evaluations were the result of Castro's deficient performance, as opposed to any discriminatory animus based on her alleged disabilities. In addition, it is undisputed that Castro was allowed to take all necessary annual and sick leave, and that she held the same position, was assigned the same responsibilities, and enjoyed the same salary and benefits throughout her employment.

This Court must note that "[w]ork places are rarely idyllic retreats, and the mere fact that an employee is displeased by an employer's act or omission does not elevate that act or omission to the level of a materially adverse employment action." *Blackie v. Maine*, 75 F.3d 716, 725 (1st Cir.1996). "If we interpreted these simple personnel actions as materially adverse, we would be sending a message to employers that even the slightest nudge or admonition (however well-intentioned) given to an employee can be the subject of a federal lawsuit...." *Sweeney v. West*, 149 F.3d 550, 557 (7th Cir.1998) (holding that two counseling statements similar to negative performance evaluations do not rise to level of "materially adverse employment action" required under Title VII). "We also would be deterring employers from documenting performance difficulties, for fear that they could be sued for doing so." *Id.* Accordingly, we find that "[t]he [defendant's] actions the plaintiff points to as evidence of its discrimination are consistent with the actions any employer might take to promote better performance from an employee who is demonstrating serious

---

**16.** Although Plaintiff also claims that she was denied lateral transfers and changes in route because of her disability, we will limit our discussion herein to her claim regarding her negative performance evaluations and warnings.

difficulties with her job duties." *Mead v. Bank of America*, No. 3:06–cv–00626–HDM–VPC, 2008 WL 706632, at *6 (D.Nev. March 14, 2008).

In light of the record of this case, this Court is unable to find that Plaintiff's negative performance evaluation and warnings constitute adverse employment actions. Plaintiff offered no proof that she was materially disadvantaged with respect to her salary, grade or other objective terms and conditions of employment, or that the performance warnings were, in whole or in part, *because of* her alleged disability. Moreover, Plaintiff is unable to establish that the negative performance evaluations she received from her former employer were undeserved, and thus, give way to a disability discrimination claim under the ADA.

As per the foregoing, we hold herein that Plaintiff has also failed to set forth proof of the third and final prong of her *prima facie* case with regard to her claim that she received negative performance reviews because of her disability.

### 4. Defendant's Legitimate Non-discriminatory Reason

In her complaint, Castro alleges that P & G denied requests for transfers and changes in route because of her disabilities. *See* Docket No. 6, ¶ 13. Although in the above discussion we held that Castro cannot establish a *prima facie* case of disability discrimination under the ADA, even if she had, we find that P & G proffered a legitimate non-discriminatory reason for denying Plaintiff's requests. We also find that one of the alleged incidents of denied request for transfer is time-barred.

The first denied request took place on January 24, 2002. *See* Findings of Fact, Section I, *infra*, ¶ 30. In its motion for summary judgment, the Defendant argues that any allegation resulting from the Jan-

uary 2002 transfer request is time barred pursuant to *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). *See* Docket No. 41 at page 22 note 10. We agree.

The same powers, remedies, and procedures used to enforce Title VII of the Civil Rights Act of 1964 ("Title VII") apply to disability discrimination claims under the ADA. See 42 U.S.C. § 12117(a). In *Morgan, supra*, the Supreme Court of the United States held that a plaintiff seeking to recover for a discrete act of discrimination, as opposed to a pattern of harassing conduct that taken as a whole constitutes a hostile work environment, must file a charge within the 180– or 300–day time period after the discrete discriminatory act occurred in accordance with 42 U.S.C. § 2000e–5(e)(1). The United States Supreme Court further held that discrete acts such as "termination, failure to promote, denial of transfer, or refusal to hire" are considered separate incidents of discrimination not part of a series of violations. *Morgan*, 536 U.S. at 114, 122 S.Ct. 2061. *See also Rojas v. Principi*, 326 F.Supp.2d 267, 275–276 (D.P.R.2004) (defining discrete act as any event "which constitutes specific employment occurrences with the potential for concrete adverse consequences on the plaintiff's employment status"). As such, said actions constitute a separate actionable "unlawful employment practice." *Morgan*, 536 U.S. at 114, 122 S.Ct. 2061. Thus, "each discrete discriminatory act starts a new clock for filing charges alleging that act." *Id.* at 102, 122 S.Ct. 2061. *See also Rivera v. P.R.A.S.A.*, 331 F.3d 183, 188–89 (1st Cir. 2003); *Figueroa–Garay v. Municipality of Rio Grande*, 364 F.Supp.2d 117, 125 (D.P.R.2005). Therefore, "[d]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Arroyo–*

*Audifred v. Verizon Wireless, Inc.*, 431 F.Supp.2d 215, 219 (D.P.R.2006).

Examples of "discrete acts" include: failure to renew contract, failure to hire for new position, suspensions from employment, deprivation of duties, failure to select plaintiff for unannounced employment positions, written counseling, and proposed admonishments and reprimands. *See Ruiz–Sulsona v. U.P.R.*, 334 F.3d 157, 160 (1st Cir.2003) (holding that failure to renew a contract and failure to hire for a new position were discrete acts of discrimination pursuant to *Morgan* ); *Rivera–Torres v. Ortiz Velez*, 306 F.Supp.2d 76, 84 (D.P.R.2002) (holding that a suspension from employment and deprivation of duties and equipment constitute discrete acts); *Rojas v. Principi*, 326 F.Supp.2d at 275 (failure to select plaintiff for unannounced employment positions, written counseling, proposed admonishments and reprimands are all considered discrete acts of discrimination).

The Supreme Court's ruling in Morgan, although discussing the continuing violation doctrine in the Title VII context, has been found to apply equally to ADA claims. See, *e.g.*, *Zankel v. Temple University*, 245 Fed.Appx. 196 (3d Cir.2007); *O'Connor v. City of Newark*, 440 F.3d 125, 128 n. 4 (3d Cir.2006) (noting that Third Circuit Court of Appeals has applied Morgan, a Title VII case, to ADA actions in two unpublished decisions); *Davidson v. America Online, Inc.*, 337 F.3d 1179, 1184 (10th Cir.2003) ("[T]he [Supreme] Court's reasoning in Morgan must be applied to cases brought under the ADA."); *Esposito v. Town of North Providence*, No. C A 04–302S, 2006 WL 2711736, at *7 (D.R.I. September 21, 2006) ("Morgan has also been extended to cases brought under the ADA."); *Zankel v. Temple Univ.*, Civil Action No. 05–2760, 2006 WL 1083600, at *5 (E.D.Pa. Apr. 24, 2006) (applying Mor-

gan to ADA claim and stating that "each time [p]laintiff made a request for a reasonable accommodation that went denied, a new clock for filing charges began"); *Voisin v. Georgia Gulf Corp.*, 245 F.Supp.2d 853, 855 (M.D.La.2002) (applying Morgan to ADA claim). Accordingly, we also find that the holding in *Morgan* applies to Plaintiff's ADA claim.

█ The record shows that on January 24, 2002 Defendant denied Plaintiff's request to be assigned to cover a different territory. It is uncontested that it wasn't until October 2, 2003 that she filed an administrative claim of discrimination. See Findings of Fact, Section I, *infra*, ¶ 50. The denial in change of territory is in effect a discrete act of alleged discrimination, but because her claim was filed well outside the 300–day limitations period, it is not actionable under *Morgan.*

Moving on to the second transfer denial, it is uncontested that the Company failed to select Plaintiff for a lateral transfer in December of 2003. The Defendant argues in its motion for summary judgment that instead of selecting Plaintiff for the open position, the Company selected Ms. Vanessa Perez, a new hire, with over ten (10) years of experience at a competing pharmaceutical company (Eli Lilly) working the metropolitan territory. *See* Findings of Fact, Section II, *infra*, ¶¶ 35–36. According to the Defendant, Ms. Perez was the best candidate for the position. *See* Docket No. 41 at page 22.

█ In her opposition, Plaintiff asserts the Defendant's reasons are pretextual. To that effect, Plaintiff states, *in a footnote,* that a colleague by the name of Daisy Diaz was promoted while on disability leave and that "better treatment of comparative employees has been cited as persuasive evidence of pretext." *See* Docket No. 50 at page 2 n. 2. However, we note that the only evidence she provides in sup-

port of these conclusory allegations is her own deposition testimony, without any explanation or reference to evidence. "Summary judgment cannot be defeated by relying on such conclusory allegations." *Rios–Jimenez,* 520 F.3d at 42 n. 7 (internal citations omitted).

In addition to the foregoing, we find that the Defendant proffers, in its defense, a legitimate business reason for its decision: that Ms. Perez was better-suited for the position than the Plaintiff because she had more years of experience in the field. The ADA is not a mandatory preference act, and thus, an employer is entitled to select better qualified employees for vacant positions instead of a disabled employee. *See E.E.O.C. v. Humiston–Keeling, Inc.,* 227 F.3d 1024 (7th Cir.2000). That is, "the ADA does not mandate a policy of 'affirmative action in favor of individuals with disabilities, in the sense of requiring that disabled person [sic] be given priority in hiring or reassignment over those who are not disabled.'" *Ladenheim v. American Airlines, Inc.,* 115 F.Supp.2d 225, 231 (D.P.R.2000), aff'd, *Gelabert–Ladenheim v. American Airlines, Inc.,* 252 F.3d 54 (1st Cir.2001). Moreover, "courts in employment discrimination cases may not act as super personnel departments, substituting judicial judgments for the business judgments of employers." *Arroyo–Audifred v. Verizon Wireless, Inc.,* 527 F.3d 215, 221 (1st Cir.2008) (affirming summary judgment for employer in age discrimination action brought by employee alleging wrongful denial of several promotions, where employer found the other candidates better suited for the position and the record lacked evidence that employer's decisions with respect to promotion were ei-

ther pretextual or motivated by discriminatory animus or policy).

Therefore, having carefully reviewed the record before the Court, we find that the Defendant articulated a legitimate, non-discriminatory reason for not transferring Plaintiff that went unrebutted by Castro. In addition, Plaintiff failed to set forth evidence that P & G's decisions were either pretextual or motivated by discriminatory animus.

In light of the foregoing, the Defendant's request for dismissal of Plaintiff's disability discrimination claim under ADA is hereby **GRANTED.**

### B. Failure–to–Accommodate Claim under ADA[17]

■■■ Under the ADA, the term "discriminate" includes "... not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer]." 42 U.S.C. § 12112(b)(5)(A). As previously mentioned, reasonable accommodations may include "job restructuring, part-time or modified work schedules, reassignment to a vacant position ... and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9). To survive a motion for summary judgment on a failure-to-accommodate claim, a plaintiff must furnish significantly probative evidence that: (a) she is a qualified individual with a disability within the meaning of the applicable statute; (b) that she works (or worked) for an employer whom the ADA covers; (c) that the employer, despite

---

17. We will briefly discuss alternative arguments in support of the dismissal of Plaintiff's failure-to accommodate claim even though our finding that Castro is not a "qualified individual with a disability" under the ADA disposes of said cause of action.

knowing of the employee's physical or mental limitations, did not reasonably accommodate those limitations; and, (d) that the employer's failure to do so affected the terms, conditions, or privileges of the plaintiff's employment. *See Higgins*, 194 F.3d at 264 (internal citations omitted).

> If ... [plaintiff] can establish a ... reasonable accommodation claim by making a sufficient showing as to each of the above ... factors, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment decision and to produce credible evidence to show that the reason advanced was the real reason.... If the defendant is able to offer such a reason, the burden then shifts back to [plaintiff] to establish that the proffered reason is pretext intended to conceal discriminatory intent.... The ultimate burden of proving unlawful action rests at all times with [plaintiff].

*Rios–Jimenez*, 520 F.3d at 41 (internal citations omitted).

In a reasonable accommodation claim, "it falls to the plaintiff to show that the accommodation would have enabled her to perform the essential functions of the job—and that the accommodation would have been reasonable in light of relevant factors such as expense, size of the employer, etc." *Id. See also Corujo–Marti*, 519 F.Supp.2d at 216 ("To show that a proposed accommodation was reasonable, a plaintiff must prove ... that the proposed accommodation would enable her to perform the essential functions of her job....")

### 1. Denial of Transfer

In her complaint. Plaintiff alleges that P & G failed to accommodate by not trans-

ferring her to lateral positions applied for and rejecting her requests for changes in route.[18] *See* Docket No. 6 at ¶ 13. As discussed in the previous section, the Defendant argued that, even if Plaintiff was a qualified individual and needed the transfer as an accommodation, an employer is allowed to select the most qualified candidate for a vacant position. *See* Docket No. 41 at page 22. We agree.

■ Although under the ADA a reasonable accommodation may include reassignment to a vacant position, a plaintiff is not entitled to be reassigned to the position of her choice. *See Ladenheim*, 115 F.Supp.2d at 231 (internal citations omitted); *Pagan–Duran*, 2007 WL 1056719 at *19 ("under the ADA a qualified individual with a disability is not entitled to the accommodation of her choice, but only to a reasonable accommodation."). Having held that P & G did indeed select a more qualified individual to cover the territory in question, we also find that "holding an employer liable for violating the ADA simply because that employer hired the most qualified applicant for the position in question can hardly be considered reasonable." *Ladenheim*, 115 F.Supp.2d at 231. In fact, "no reasonable factfinder could conclude that the duty to provide a reasonable accommodation includes hiring a less-qualified employee simply because that employee is disabled." *Id.* at 231 n. 6. *See also Huber v. Wal–Mart Stores, Inc.*, 486 F.3d 480 (8th Cir.2007) (the ADA does not require an employer to reassign a qualified disabled employee to a job for which there is a more qualified applicant). Thus, we find no violation of the Act on the part of the Defendant for not transferring Plaintiff to cover a different territory.

---

**18.** Having already decided that the Defendant's denial of Plaintiff's request of January 24, 2002 is time-barred, we will only discuss the second denial for change in territory that took place on December of 2003.

The Court notes that Plaintiff's request for transfer is premised on the fact that the territory covered in the lateral position was less widespread. *See* Docket No. 4, Exhibit R. Nevertheless, it is undisputed that during Plaintiff's tenure as Medical Account Manager she sought treatment with, at least, seven (7) different doctors, and none gave her a written recommendation indicating that her impairments required a change in territory. *See* Findings of Fact, Section I, *infra*, ¶ 37. That is, although Plaintiff categorizes this transfer as a "reasonable accommodation," she never explains how this change in territory actually amounted to an accommodation that was both reasonable and would have enabled her to perform the essential functions of her job, or provided any medical evidence in support of her contention. "All that [plaintiff] can present in support of her reasonable accommodation claim is her own self-serving testimony, and in this case, that is just not sufficient...." *McPhaul v. Board of Com'rs of Madison County*, 226 F.3d 558 (7th Cir.2000) (holding that employee allegedly suffering from fibromyalgia was not qualified individual, and thus could not maintain ADA claim challenging transfer and termination, inasmuch as she was unable to perform essential functions of those positions, with or without accommodation; employee did not dispute supervisor's evaluations documenting her performance deficiencies, and provided no medical evidence that requested accommodation would have improved her performance), *cert. denied, McPhaul v. Board of Com'rs of Madison County*, 532 U.S. 921, 121 S.Ct. 1358, 149 L.Ed.2d 288 (2001). Therefore, Castro's ADA failure-to-accommodate claim fails on these grounds as well.

#### 2. Additional Medical Leave of Absence

Finally, in her opposition, Plaintiff adds that the Defendant failed to accommodate her disabilities by denying an additional leave of absence after the expiration of her twelve-month medical leave with the SIF. *See* Docket No. 50. However, the Defendant submits that they had no duty to accommodate inasmuch as Plaintiff's request for additional leave was unreasonable. *See* Docket No. 41.

■ It stems from the record that on March 2, 2004, Plaintiff was involved in a car accident and took a leave of absence to seek medical treatment with the SIF. On February of 2005, Plaintiff contacted the Company and informed them that her next appointment with the SIF was on March 30, 2005, and that she did not feel like she could return to work. *See* Findings of Fact, Section I, *infra*, ¶ 55. Upon lapse of a twelve-month leave of absence for treatment with the SIF, P & G informed Plaintiff in a letter dated March 8, 2005 that her employment was being terminated because of her failure to return from the leave. At the time of termination, Plaintiff had not been cleared to work by the SIF, or provided an expected release date. Then, in a letter dated March 14, 2005, Plaintiff stated her disagreement with her termination, and asserted that her next appointment was not until March 30, 2005, and thus, it would not be until then that she would know whether or not she would be released to work. *See* Findings of Fact, Section I, *infra*, ¶ 56–57.

In *Garcia–Ayala v. Lederle Parenterals, Inc.*, 212 F.3d 638 (1st Cir.2000), the First Circuit held that an additional leave of absence beyond the one-year job reservation period normally provided under an employer's policies is not per se an unreasonable accommodation. *See id.* at 647. However, the First Circuit has also held that a "plaintiff has the burden of showing that she sufficiently requested the accom-

modation in question. The employee's request (1) must be sufficiently direct and specific, and (2) must explain how the accommodation requested is linked to some disability." *Freadman v. Metropolitan Property and Cas. Ins. Co.*, 484 F.3d 91, 102–103 (1st Cir.2007) (internal citations and quotation marks omitted). The record of this case is devoid of such a showing. As previously mentioned, the problem with Plaintiff's contention is that prior to receiving a notice of termination, Castro never made a direct and specific request that she needed additional leave of absence beyond the twelve-month reserve period. *See Mole*, 165 F.3d at 1217 (internal citations and quotation marks omitted). Therefore, "[Plaintiff's] accommodation claim nevertheless founders due to her failure to produce evidence that would permit a jury to conclude that the employer was put on notice of a 'sufficiently direct and specific' request for her desired accommodation." *Freadman*, 484 F.3d at 103.

In light of the foregoing, the Defendant's request for dismissal of Plaintiff's failure-to-accommodate claim under ADA is hereby **GRANTED**.

## C. Disability Harassment Claim under ADA

In her complaint, Castro alleges that she was subjected to a pattern of harassment that included threats of termination and amounted to a hostile work environment because she engaged in protected conduct. *See* Docket No. 6, ¶¶ 14–15. In its motion for summary judgment, the Defendant seeks dismissal of this claim by setting forth proof that the admonishments Castro received were based on her poor performance, and arguing that an employer is not required to overlook performance problems, even when the employee has a statu-

torily covered disability. *See* Docket No. 41 at pages 14–16. We agree.

■ ˙ "It has been held that, similar to Title VII discrimination actions, ADA-covered individuals may assert hostile work environment claims premised on disability-based harassment." *Rodriguez Velazquez v. A.M.A.*, 502 F.Supp.2d 200, 209 (D.P.R. 2007) (citing *Quiles–Quiles v. Henderson*, 439 F.3d 1, 5 n. 1 (1st Cir.2006) (assuming disability harassment as a viable theory of recovery under the Rehabilitation Act)). In fact, "the elements used for Title VII hostile environment claims have been adapted to ADA cases." *Rodriguez Velazquez*, 502 F.Supp.2d at 209. Accordingly, the elements a plaintiff must prove to succeed on a claim of disability-based harassment are: (1) that she belongs to a protected group; (2) that she was subjected to unwelcome harassment; (3) that the harassment complained of was based on her disability or disabilities; (4) that the harassment complained of affected a term, condition, or privilege of employment; and (5) that the employer knew or should have known of the harassment and failed to take prompt, remedial action. *Id.*

To establish a hostile work environment, a plaintiff must show that his/her "workplace was permeated with discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive to alter the conditions of ... [her] employment and create an abusive working environment." *Quiles–Quiles*, 439 F.3d at 7 (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *Mannie v. Potter*, 394 F.3d 977, 982 (7th Cir.2005) (applying "severe and pervasive" standard in disability harassment case under the Rehabilitation Act)). "Among the factors relevant to this inquiry are the severity of the conduct, its frequency, and whether it unreasonably interfered with the victim's work performance." *Quiles–Quiles*, 439

F.3d at 7 (*citing Harris*, 510 U.S. at 23, 114 S.Ct. 367). In addition, a Plaintiff must show that "the objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it abusive and the victim in fact did perceive it to be so...." *Whitlock v. Mac–Gray, Inc.*, No. Civ.A. 00–10546–GAO, 2002 WL 31432688, at *3 (D.Mass. October 30, 2002).

■ The record of this case reflects that Plaintiff was admonished on a number of occasions for failing to fulfill her call objectives and submit the required expense reports on time. As discussed in the previous sections, Plaintiff does not challenge the deficiencies in her performance asserted by the Defendant. Also, it is undisputed that Plaintiff was on sick leave from October 30th to December 1st, 2003, and that on November 10, 2003, P & G warned Plaintiff in writing that no medical certificate had been submitted to justify the absences. Hence, the Company instructed Plaintiff to provide proper documentation in accordance with Company policy or otherwise, her employment would be terminated. *See* Findings of Fact, Section I, *infra*, ¶¶ 50–51. Although Plaintiff excuses her behavior by submitting that the Company fax was not working, and hence, was unable to send the medical certificate on time, Plaintiff does not deny that by the date of the warning, the Company had not actually received a medical certificate justifying her sick leave. *See* Findings of Fact, Section I, *infra*, ¶ 53.

Although we have previously held that Plaintiff does not belong to a protected group inasmuch as she is not a qualified individual with a disability under ADA, the uncontested facts of this case lead us to conclude that the harassment complained of was not based on her alleged disabilities. First of all, Castro has not proffered evidence tending to show that the negative evaluations and warnings she received were unwarranted. Nor has she set forth proof that the Defendant's allegedly harassing conduct was *because of* her alleged disabilities, as opposed to the Defendant's legitimate, nondiscriminatory concerns regarding her poor performance and lack of compliance with Company policies. "[T]he 'abusive treatment' to which [plaintiff] claims [she] was subjected (reprimands and negative performance evaluations) were only ordinary and incidental criticism that any supervisor might present against an employee who occasionally produced poor work or broke workplace rules." *Whitlock*, 2002 WL 31432688, at *3. *See also Corujo–Marti*, 519 F.Supp.2d at 221 n. 7 (dismissing plaintiff's disability harassment claim under ADA for failure to contest that she had a pattern of delay and non-compliance with established job standards and therefore, alleged comments made by supervisor with regards to her performance were not made with the intention to "harass" her).

Second, the proffered evidence fails to show that the alleged harassment toward her was both "objectively offensive" and "sufficiently severe and pervasive" such that a reasonable person would find it abusive or to the point that it permeated her work environment. "Conversations between an employee and [her] superiors about [her] performance does [sic] not constitute harassment simply because they cause the employee distress." *Keever v. City of Middletown*, 145 F.3d 809, 813 (6th Cir.1998).[19] Plaintiff's facts, even if true,

---

19. *See also Plautz v. Potter*, 156 Fed.Appx. 812 (6th Cir.2005) (criticisms of plaintiff's performance or attendance did not constitute "harassment" sufficient to create hostile work: environment, under the Rehabilitation Act, absent evidence that employee was ridi-

are insufficient to support her claim because they "do not rise to the severity and pervasiveness necessary to sustain a hostile work environment charge." *Corujo–Marti*, 519 F.Supp.2d at 222 (*citing Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 509 (5th Cir.2003)).

In accordance with the foregoing, we find that no reasonable trier of fact could find that Castro suffered from disability-based harassment that amounted to a hostile work environment, and thus, the Defendant's request for dismissal of this claim is hereby **GRANTED**.

## D. ADA Retaliation Claim

■ In her complaint, Castro alleges that she engaged in protected conduct, namely, complaining to her supervisor, and as a result, she was retaliated against. The alleged acts of retaliation included threats of termination, and eventually, her discharge. *See* Docket No. 6. In its motion for summary judgment and reply, the Defendant argues that Plaintiff was terminated upon lapse of a twelve-month leave of absence for treatment with the SIF, not because of her disability. *See* Dockets No. 41 & 59. On the other hand, Castro argues in her opposition that P & G threatened her with termination in November of 2003 after she complained of disability discrimination to her supervisor and filed discrimination charges in the ADU in October of 2003. *See* Docket No. 50. She also avers that P & G discharged her from her employment in March of 2005 after she filed the present complaint in November of 2004. *Id.*

"An ADA plaintiff may assert a claim for retaliation even if she fails to succeed on a disability claim." *Freadman*, 484 F.3d at 106 (internal citations omitted). The ADA's retaliation provision states that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a).

■ To establish a *prima facie* case of retaliation, a plaintiff must show: (1) that she engaged in protected conduct, (2) that she suffered an adverse employment action, and (3) that there was a causal connection between the protected conduct and the adverse employment action. *See Calero–Cerezo*, 355 F.3d at 25. "The essence of a retaliation claim is that the plaintiff engaged in conduct protected by the Constitution or by statute, the defendant took an adverse action against the plaintiff, and this adverse action was taken (at least in part) because of the protected conduct." *Corujo–Marti,* 519 F.Supp.2d at 222 (*citing Sifre v. Department of Health*, 38 F.Supp.2d 91, 101 (D.P.R.1999), *aff'd*, 214 F.3d 23, 26 (1st Cir.2000)).

### 1. Warning (Termination Threat)

With regard to the first prong, it has been held that protected conduct includes not only the filing of administrative complaints, but also complaining to one's supervisors. *Olivieri v. Abbot Laboratories*, Civil No. 05–1244(ADC), 2008 WL 747082, at *29 (D.P.R. March 19, 2008) (*citing

culed or insulted because of his medical condition to the point that it permeated the workplace environment); *Angelone v. Seyfarth Shaw, LLP,* No. CIV. S–05–21G6 FCD JFM, 2007 WL 1033458 (E.D.Cal. April 3, 2007) (holding that no reasonable person would find plaintiff's complaints of defendant's criticism

of her job performance to be objectively abusive); *Lucenti v. Potter,* 432 F.Supp.2d 347 (S.D.N.Y.2006)(allegations of even constant reprimands and work criticism by themselves are not sufficient to establish a hostile environment claim, absent a showing of discriminatory animus).

*Valentin–Almeyda v. Municipality of Aguadilla*, 447 F.3d 85, 94 (1st Cir.2006)). Here, the evidence on record shows Castro engaged in protected activity, including filing an administrative claim with the ADU on October 2, 2003, and sending an e-mail to her supervisor complaining of discrimination on the very next day. *See* Findings of Fact, Section I, *infra*, ¶ 50.

As to the second prong, the First Circuit has held that adverse employment actions include "demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations, and toleration of harassment by other employees." *Marrero v. Goya of Puerto Rico, Inc.*, 304 F.3d 7, 23 (1st Cir.2002). In the case at hand, although Plaintiff argues that the Defendant's November 10, 2003 warning for failing to provide medical certificate constitutes an adverse employment action, we have already held that these events were not adverse employment actions. Thus, Plaintiff fails to meet the second prong of the applicable test.

At any rate, even if she had established a *prima facie* case of retaliation, we alternatively find that Plaintiff is unable to establish that the Defendant's proffered reason to issue a warning to Plaintiff threatening her with termination is a pretext for retaliation. "Once the plaintiff has made a *prima facie* showing of retaliation, the *McDonnell Douglas* burden-shifting approach is employed, and defendant must articulate a legitimate, non-retaliatory reason for its employment decision." *Calero–Cerezo*, 355 F.3d at 26. "If the defendant meets this burden, the plaintiff must now show that the proffered legitimate reason is in fact a pretext and that the job action was the result of the defendant's retaliatory animus." *Id.* (internal citations omitted).

As previously discussed, the Defendant proffered a legitimate, non-retaliatory rea-

son for the warning: Castro's lack of compliance with a Company policy requiring employees to provide a medical certificate when on sick leave. In response, relying on the First Circuit's decision in *Hodgens v. General Dynamics Corp.*, 144 F.3d 151 (1st Cir.1998), Castro argues that the temporal proximity between her complaints and the warning give rise to an inference of pretext and retaliation. *See* Docket No. 50 at page 27. Notwithstanding, "[w]hile [plaintiff] is correct that temporal proximity may give rise to a suggestion of retaliation, ..., that suggestion is not necessarily conclusive. We must remember that it is the employee's burden to show pretext, sufficient to survive summary judgment." *Hodgens*, 144 F.3d at 170.

As per the foregoing, we find that the Defendant has, in fact, identified a justified specific reason for the employment action taken against Castro "having nothing to do with any impulse to retaliate against her for protected conduct." *Calero–Cerezo*, 355 F.3d at 26. In response, Plaintiff completely relies on the temporal proximity of the incidents, and neglects to produce sufficient evidence for a rational jury to conclude that those reasons were a pretext for discrimination. In fact, Plaintiff does not deny not having successfully sent the relevant medical certificate by the date of the warning. Thus, the circumstantial fact of temporal proximity is weakened considerably by Castro's admitted failure to abide by Company rules. *Hodgens*, 144 F.3d at 171.

"Since [Plaintiff] has failed to point to specific facts that would demonstrate any sham or pretext intended to cover up [Defendant's] retaliatory motive," *Calero–Cerezo*, 355 F.3d at 26, we hereby **GRANT** the Defendant's request for dismissal of Castro's retaliation claim stemming from her complaints of discrimination and the

filing of administrative charges against the Company.

## 2. Termination

██ We now turn to Castro's claim that she was terminated in retaliation for filing a complaint in this Court against the Defendant. It is uncontested that on March 2, 2004, Plaintiff had an accident and went on medical leave with the SIF. Plaintiff filed the above-captioned claim on November 16, 2004, and was terminated approximately four (4) months later, on March 4, 2005. Therefore, there is no doubt that Plaintiff engaged in protected conduct and that she suffered an adverse employment action.

In its motion for summary judgment, the Defendant argues that its decision to terminate Castro from her employment was not based on her disability, but on her failure to return from a leave of absence with the SIF after the twelve-month period provided by local law ended. In response, Plaintiff does not provide any additional evidence to establish the causal connection between the protected conduct and the adverse employment action other than alluding to the temporal proximity of the filing of her complaint and her termination.

To establish causal connection, it is insufficient for a plaintiff to merely state that she engaged in a protected activity and then was disciplined. *See Kosereis v. Rhode Island,* 331 F.3d 207, 217 (1st Cir. 2003). The adverse employment action complained of "must have been for the purpose of retaliating. And to defeat summary judgment, a plaintiff must point to some evidence of retaliation by a pertinent decisionmaker." *Randlett v. Shalala,* 118 F.3d 857, 862 (1st Cir.1997). "This need to show a connection exists whether [Plaintiff] [is] seeking to make out a prima facie case or by independent evidence challenging the [Defendant's] explanation as pre-

text...." *Id.* at 863. "Moreover, the inference of a causal connection becomes more tenuous with time." *Dressler v. Daniel,* 315 F.3d 75, 80 (1st Cir.2003). "The Supreme Court has stated that the cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close." *Calero–Cerezo,* 355 F.3d at 25 (*citing Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 273–74, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001)). "Three and four month periods have been held insufficient to establish a causal connection based on temporal proximity." *Id.* (*citing Richmond v. ONEOK, Inc.,* 120 F.3d 205, 209 (10th Cir.1997); *Hughes v. Derwinski,* 967 F.2d 1168, 1174–75 (7th Cir.1992)).

Almost four (4) months elapsed between the filing of the complaint and Castro's termination. According to the relevant caselaw the temporal proximity is not close enough. Thus, Plaintiff is unable to make out a *prima facie* case of retaliation with regard to her termination.

At any rate, even if Castro established a *prima facie* case of retaliation, P & G offered a legitimate reason for Castor's termination, which went unrebutted by Castro. *See Corujo–Marti,* 519 F.Supp.2d 201 (D.P.R.2007) (finding that employee's failure to return to work before the expiration of the one-year reserve period established by Puerto Rico's short term non-occupational leave statute was legitimate, non-discriminatory reason under the ADA for terminating employee, and was not pretext for disability discrimination); *Orta–Castro v. Merck, Sharp & Dohme Quimica P.R.,* 447 F.3d 105 (1st Cir.2006) (affirming summary judgment in favor of defendant-employer in ADA claim finding that decision to terminate employee was based on her failure to return from leave

of absence for non-occupational depressive condition after three hundred and sixty five days period provided by law ended).

Having failed to establish a *prima facie* case of retaliation as well as show that P & G's articulated reason for her discharge was a pretext for retaliation based on her filing of this complaint, we hereby also **GRANT** the Defendant's request for dismissal of Plaintiff's retaliation claim.

## E. FMLA Retaliation

"The Family and Medical Leave Act was enacted in an effort to help working men and women balance the often conflicting demands of work and life by recognizing that there are times in a person's life when work must yield to medical needs." *Caraballo v. Puerto Rico Telephone Co., Inc.,* 178 F.Supp.2d 60, 65 (D.P.R.2001) (*citing Hodgens,* 144 F.3d at 159). "To achieve this objective, the FMLA seeks to balance authentic family needs and legitimate employer interests.... This accommodation entails a set of entitlements for employees and a matched set of rules for employers." *Corujo–Marti,* 519 F.Supp.2d at 223 (internal citations omitted).

"The FMLA contains two distinct types of provisions: those establishing substantive rights and those providing protection for the exercise of those rights." *Colburn v. Parker Hannifin/Nichols Portland Div.,* 429 F.3d 325, 330 (1st Cir.2005). The provisions of the act entitle eligible employees to a total of 12 workweeks of leave, which may be taken intermittently when medically necessary, for a serious health condition that makes the employee unable to perform the functions of her position. *See id.* (*citing* 29 U.S.C. §§ 2612(a)(1)(D), 2612(b)). "Following a qualified absence,

the employee is entitled to return to the same position or an alternate position with equivalent pay, benefits, and working conditions, and without loss of accrued seniority." *Hodgens,* 144 F.3d at 159 (*citing* 29 U.S.C. § 2614(a)(1); 29 C.F.R. §§ 825.100(c) (1997)).

"In addition to creating the above entitlements, the FMLA provides protection in the event an employee is discriminated against for exercising those rights." *Id.* at 159–160 (*citing* 29 U.S.C. § 2615(a)(1) & (2); 29 C.F.R. § 825.220 (1997)).[20] Employers are also specifically prohibited from using the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions. *See* 29 C.F.R. § 825.220(c). "An employer who flouts these rules can be held liable for compensatory damages and, unless the violation occurred in good faith, additional liquidated damages.... Appropriate equitable relief, such as reinstatement, also may be available." *Navarro v. Pfizer Corp.,* 261 F.3d 90, 95 (1st Cir.2001) (internal citations omitted).

In her complaint, Plaintiff alleges that the Defendant violated the FMLA by retaliating against her for exercising her rights under this statute. *See* Docket No. 6 at ¶ 14. In their motion for summary judgment, the Defendant argues that Plaintiff was allowed to take leave of absences, and upon return, with the exception of her last medical leave with the SIF, she was assigned the same position, responsibilities and duties. The Defendant also argues that the Plaintiff suffered no adverse employment action due to these absences. *See* Docket No. 41 at page 23. In the section of her opposition that discusses the merits of her FMLA claim,

---

**20.** Specifically, the FMLA states that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter," 29 U.S.C. § 2615(a)(1), and that "[i]t shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter," 29 U.S.C. § 2615(a)(2).

aside from explaining that she suffered from a serious health condition, Plaintiff simply states that her leaves were protected under the FMLA, and "taking them in consideration for adverse employment action, including termination is actionable." *See* Docket No. 50 at page 32. "[T]he Court is not in the habit of doing counsel's work," *Caraballo,* 178 F.Supp.2d at 66, and thus, we will not endeavor to guess all the possible adverse employment actions Plaintiff may be referring to. Accordingly, we will only discuss Plaintiff's FMLA claim as it pertains to her termination.[21]

 We assess a claim of FMLA retaliation following the *McDonnell Douglas* three-step process, that is, in the same manner that we would evaluate a claim of retaliation under other employment statutes, such as the ADA or Title VII. *See Hodgens,* 144 F.3d at 160–161. To make out a *prima facie* case of retaliation under these sections, a plaintiff must show: (1) that she engaged in a protected action (here, requesting or taking FMLA leave); (2) that she suffered an adverse employment action; and (3) that there was some possibility of a causal connection between the employee's protected activity and the employer's adverse employment action, in that the two were not wholly unrelated. *See Colburn,* 429 F.3d at 336 (*citing Hodgens,* 144 F.3d at 161). If she does so, then the burden shifts to the employer "to

articulate some legitimate, nondiscriminatory reason for the employee's termination, sufficient to raise a genuine issue of fact as to whether it discriminated against the employee." *Corujo–Marti,* 519 F.Supp.2d at 224 (internal citations omitted). "If the employer's evidence creates a genuine issue of fact, the presumption of discrimination drops from the case, and the plaintiff retains the ultimate burden of showing that the employer's stated reason for terminating [her] was in fact a pretext for retaliating against [her] for having taken protected FMLA leave." *Hodgens,* 144 F.3d at 161.

As stated under the above discussion regarding retaliation under ADA, even if Castro established a *prima facie* case of retaliation, P & G offered a legitimate reason for Castro's termination: her failure to return to work from her medical leave with the SIF upon lapse of the twelve-month reserve period. However, Castro failed to produce evidence of pretext. Thus, we hereby **GRANT** the Defendant's request as to dismiss Castro's retaliation claim under the FMLA.

## F. Puerto Rico Claims

The remainder of Plaintiff's claims are grounded on Puerto Rico law. "A district court retains the discretion, however, to decline to exercise supplemental jurisdiction where the district court has dismissed

---

**21.** Even if we considered Plaintiff complaints that the Defendant considered her absences in her performance evaluations, her claim fails inasmuch as we have already held that Plaintiff's negative performance evaluations and warnings do not constitute adverse employment actions. Castro was allowed to take several medical leaves, some lasting as long as six months, and upon return, was assigned to the same position, with the same responsibilities, salary and benefits. *See also Abrahamson v. Sandoz, Inc.,* Civil Action No. 06–cv–00636–WYD–MJW, 2008 WL 906124 (D.Colo. March 31, 2008) (holding that a written warning may be an adverse employment

action for purposes of a FMLA claim only if it effects a significant change in the plaintiff's employment status); *Robinson v. Fulton County, Ga.,* Civil Action No. 1:05–CV–2250–RWS, 2008 WL 78711 (N.D.Ga. January 4, 2008) (employer's issuance of multiple memoranda and written warnings about plaintiff's absences do not rise to the level of adverse employment action, and instead fall under the category of "petty slights or minor annoyances"; warnings, negative performance reviews or critiques are ordinarily not considered adverse employment actions, unless they result in a tangible loss of pay or benefits).

all claims over which it had original jurisdiction." *Marrero–Gutierrez v. Molina,* 491 F.3d 1, 7 (1st Cir.2007) (*citing* 28 U.S.C. § 1367(c)(3); *Rodriguez v. Doral Mortgage Corp.,* 57 F.3d 1168, 1177 (1st Cir.1995)). Having dismissed all federal law claims, we will not exercise supplemental jurisdiction over the state law claims. Therefore, Plaintiff's claims arising from Puerto Rico law are hereby **DISMISSED WITHOUT PREJUDICE.**

## IV. CONCLUSION

For the reasons stated above, this Court hereby **GRANTS IN PART** Defendant's motion for summary judgment (Dockets No. 40–42). Accordingly, Plaintiff's claims pursuant to the ADA and the FMLA are hereby **DISMISSED WITH PREJUDICE.** Having declined to accept supplemental jurisdiction over Plaintiff's claims under Puerto Rico law, the Court hereby **DISMISSES WITHOUT PREJUDICE** Plaintiff's supplemental claims.

**IT IS SO ORDERED.**